## INNOVATIVE NETWORKS, INC., Plaintiff,

v.

**Albert YOUNG, William Young, Satellite Airlines Ticket Center, Inc., Satellite Center of Orlando, Inc., Port Aviation Centers, Inc., Satellite Airlines of Grand Central, Inc., En Route Enterprises, Inc., and Satellite III Airline Ticket Corp., Defendants and Third–Party Plaintiffs,**

v.

**Bernard T. BARTON, Jr., Third–Party Defendant.**

No. 92 Civ. 2408 (SWK).

United States District Court, S.D. New York.

Sept. 17, 1997.

W. James MacNaughton, Woodbridge, NJ, for Plaintiff.

Meyers Tersigni Lurie Feldman & Gray, by Anthony L. Tersigni Richard N. Gray, New York City, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KRAM, District Judge.

In this action for copyright and trade dress infringement, tortious interference with con-

tract, unfair competition, and inducing and participating in the breach of fiduciary duties, plaintiff Innovative Networks, Inc. ("INI") seeks damages in the amount of $6,319,912.14, an accounting and rendering of the profits derived from illegal conduct, plus prejudgment interest, punitive damages, injunctive relief and an award of attorneys' fees and costs. Defendants Albert Young, William Young, Satellite Airline Ticketing Centers, Inc., Satellite Center of Orlando, Inc., Port Aviation Centers, Inc., Satellite Airlines of Grand Central, Inc., En Route Enterprises, Inc. and Satellite III Airline Ticket Corp (collectively, the "Satellite Defendants") assert a third-party claim against Bernard T. Barton, Jr. ("Barton") for indemnification with respect to damages awarded in favor of INI.

On January 6, 1997 through January 16, 1997, the Court held a bench trial on these claims.[1] As set forth fully in the following findings of fact and conclusions of law, the Court finds in favor of plaintiff INI on the copyright claim and on the participation in the breach of fiduciary duties claim. However, the Court finds that INI is not entitled to an award of damages for either of these claims. The Court finds in favor of the Satellite Defendants on all other counts.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW [2]

INI brings this action against the Satellite Defendants, alleging copyright infringement pursuant to the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.* (Count One), trade dress infringement pursuant to § 43(a) of the

Trademark Act of 1946, 15 U.S.C. § 1125(a) (Count Two), and common law claims for tortious interference with contract (Count Three), unfair competition (Count Four), and inducing and participating in the breach of fiduciary duties (Count Five). Specifically, INI argues that the Satellite Defendants infringed its copyright in design plans for retail facilities, misappropriated the distinct and unique appearance of the INI facilities, procured the breach of Barton's employment contract with INI, misappropriated INI's internal documents, and participated in the breach of Barton's fiduciary duties to INI as an officer, director and shareholder of INI. The Satellite Defendants assert a third-party claim against Barton for contractual indemnification in the event they are found liable for damages on any of INI's claims.

### FINDINGS OF FACT

### I. The Parties

INI is a New York corporation with offices in New York City. Leonard Kleiman and his sons, David Kleiman and Steven Kleiman (collectively, the "Kleimans"), are principals of INI. The Kleimans are also involved in several other real estate businesses. Joint Pretrial Order ("JPTO") ¶ 5(c); Trial Tr. at 342–43.

From 1989 until mid–1992, INI was engaged in the business of owning and operating business retailing facilities in which multiple users occupy a single retail space. The centers owned by INI were travel related and commonly known as airline business centers or city ticket offices ("CTOs"). Airlines and other travel related companies lease counter and office space in a CTO for the

---

1. In its January 4, 1995 Memorandum Opinion and Order, the Court: (1) granted the Satellite Defendants' motion for judgment on the pleadings dismissing the copyright claim to the extent that it alleged a claim for copyright infringement based on the unauthorized copying of certain plans; (2) granted INI's motion for summary judgment on liability as to the copyright claim with respect to the floor plan, but denied the motion with respect to cabinet designs; (3) granted the Satellite Defendants' motion for judgment on the pleadings dismissing the unfair competition and misappropriation claims to the extent that they were based on the alleged misappropriation of the floor plan, and the claim of conspiracy and for punitive damages to the ex-

tent that they were based on the underlying claims that the Court had dismissed; and (4) denied the parties' remaining motions for judgment on the pleadings and summary judgment. *See Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.,* 871 F.Supp. 709, 716–32 (S.D.N.Y.1995).

2. The background of this action is set forth in detail in *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.,* 871 F.Supp. 709, 713–16 (S.D.N.Y.1995), familiarity with which is presumed. Only those facts relevant to the disposition of this opinion shall be recited below.

purpose of selling tickets and other services to the public. INI was in the business of leasing space and constructing CTO facilities that were then subleased to one or more airlines and other travel related companies. Pl.'s Trial Exh. ("PX") 212 at ¶ 8.

Defendants Albert Young and William Young are residents of New York. Albert Young is an officer, director and shareholder of defendant Satellite Airlines Ticket Center, Inc. Albert Young is also an officer, director and shareholder of the following defendant companies which owned CTOs: (1) En Route Enterprises; (2) Port Aviation Centers, Inc.; (3) Satellite III Airlines Ticket Corp.; (4) Satellite Airlines Center of Orlando, Inc.; and (5) Satellite Airlines of Grand Central, Inc. JPTO ¶ 5(f). Albert Young has been in the CTO business for approximately twenty-five years and has longstanding relationships with a number of airlines, Trial Tr. at 805–08, including United Airlines, USAir and Continental Airlines, each of who occupied more than one facility owned by Albert Young. Trial Tr. at 808.

In late 1988 or early 1989, Barton contacted the Kleimans to interest them in going into the CTO business with him and an associate, Phil Godown ("Godown"). Trial Tr. at 273–76. On or about February 24, 1989, Barton and Godown entered into a letter of intent agreement with one of the Kleimans' affiliated entities, Leonard Kleiman Associates, to form a new brokerage operation to engage in the CTO business and other real estate activities. Trial Tr. at 26; PX 88. Prior to working for INI, Barton worked for Phonex, Inc. ("Phonex"), building business retailing centers. Trial Tr. at 24. Barton had minimal experience in developing CTOs and no contacts in the airline industry. Trial Tr. at 30.

In or about March 1989, Albert Young and the Kleimans met and discussed a joint venture. Later that year, INI first entered into the business of operating airline CTOs. JPTO ¶ 5(1), (m). On August 14, 1989, Barton and INI entered into an employment agreement (the "Employment Agreement"), pursuant to which Barton became a vice-president of INI, and was responsible for identifying prospective sites and occupants for CTOs. Un-

der the terms of the Employment Agreement, Barton's duties consisted of (1) finding potential locations and negotiating the terms of the master leases at such locations; and (2) identifying potential subtenants to occupy counter space and negotiating the terms of the subleases for such space. PX 1 at ¶ 1.

The initial term of the Employment Agreement was six months, ending January 31, 1990. PX 1 at ¶ 2. Barton continued to work for INI after the expiration of the six month term of the Employment Agreement without entering into a new written agreement. On July 24, 1991 Barton was fired for, inter alia, "forging signatures on corporate checks, diverting funds for personal gain, misrepresenting [his] authority in ultra vires [sic] acts and defrauding persons within and without the company." PX 49; see JPTO ¶ 5(j).

The Employment Agreement included a restrictive covenant that provided that Barton would not use or disclose any "Privileged Information," defined as "all of the business leads developed during the course of employment with respect to potential master lessors, sublessors, market studies, business plans and any other lists or data generated" by INI. PX 1 ¶ 4. The Employment Agreement also provided that Barton would not compete with INI for a period of one year "from the date of termination of employment." Id.

On August 14, 1989, Barton and the Kleimans also entered into a shareholders agreement (the "Shareholders Agreement"), which provided that: (1) Barton would own twenty percent of the stock in INI; (2) the Kleimans would own seventy percent of the stock in INI; (3) Barton would be a director of INI; (4) in the event Barton's employment was terminated, his stock would be deemed offered for sale to INI and the offer would be deemed accepted; (5) the purchase price for the stock would be determined by the parties "from time to time"; and (6) Barton could, upon timely notice to INI, elect to defer the date for calculating the purchase price for his stock and the date for concluding the sale for up to three years. PX 2. The Shareholders Agreement superseded the prior letter of intent. See PX 88.

While employed by INI, Barton developed contacts in the airline and travel industries. These contacts were developed through seminars and meetings. Barton's contacts included David Mitzner, Debra Trainor and Donald Duff ("Duff") of United Airlines, Trial Tr. at 36, Bill Howard, Jerry Barnack and Jack Purdy of USAir, Trial Tr. at 40–41, Steve Cossette and Bichlien Kaldahl of Continental Airlines, Trial Tr. at 41, Joe DiVincenzo of Trans World Airlines, Trial Tr. at 42, Gordon Tolbert of Northwest Airlines, Trial Tr. at 42–43, Jane Pizzo of Thomas Cook Currency Exchange, Inc., Trial Tr. at 45, and Mike Harrelson of DHL Packaging Services, Inc. These individuals were all influential in determining whether their respective businesses would rent counter space at a CTO. Barton's contacts with these companies were such that they would "go with" Barton when he left INI. PX 133, 152, 153; Trial Tr. at 30–36, 90–92.

## A. Standard License Agreement

INI created a standard license agreement for the occupancy of CTOs by INI's clients (the "Standard License Agreement"). The Standard License Agreement allowed the legal departments of INI's customers to "pre-approve" the agreement. PX 212 ¶ 20; Trial Tr. at 84–85. Barton was familiar with the Standard License Agreement and he negotiated Standard License Agreements with United Airlines, USAir, Northwest Airlines, Trans World Airlines, Continental Airlines and Federal Express. PX 212 ¶ 22; Trial Tr. at 93.

## B. 32mm Insert System

David Kleiman designed a system for the construction of inserts in the cabinets placed in a CTO (the "32mm Insert System"). The 32mm Insert System was designed to hold many different configurations of equipment used by the airlines. PX 12, 68–70, 179–90; Trial Tr. at 205–214.

The panel components of the 32mm Insert System were manufactured by ViewRite in California and inserted into counter shells. In February 1992, INI obtained copyright registration on the plans for the 32mm Insert System. PX 108–10; Trial Tr. at 215–18.

## C. The Orlando Facility

Prior to the termination of his employment by INI, Barton worked on a proposed airline CTO that INI was considering opening in Orlando, Florida (the "Orlando Facility"). JPTO ¶ 5(o). At the time it fired Barton, INI had been negotiating the Orlando lease for approximately five months. Trial Tr. at 398–400. During this period, INI had not received commitments from airlines to rent a sufficient number of counters in Orlando to achieve the "critical mass" that would allow it to run the facility at a profit. Trial Tr. at 644.

INI had also developed a set of plans for the construction of the Orlando Facility, including a floor plan. *See* Blueprint for the construction of the INI Orlando Center, PX 33 (the "Orlando Floor Plan"). In or about February, 1992, INI filed a copyright registration for the Orlando Floor Plan. In or about mid-September 1991, INI learned that Albert Young was proceeding with the Orlando project. Trial Tr. at 251.

## II. The Falling Out

During the time that Barton was employed by INI, INI opened and operated two CTOs, one at Water Street in New York and one at Maiden Lane in San Francisco. INI had never made a profit and had cumulative losses of more than $340,000. JPTO ¶ 5(n); DX X at 403; DX F. At the time INI fired Barton, he was a key employee of INI's business, and was substantially in charge of its day to day operations. Trial Tr. at 363; Def.'s Trial Exh. ("DX") Z–1 at 35. During the time he was employed by INI, Barton had allegedly embezzled more than $60,000 from INI, forged leases for Northwest Airlines and USAir at the Water Street location (leaving INI with only three of seven counters occupied by paying customers), and altered leases of other airlines at both the Water Street and Maiden Lane locations, granting greater concessions than INI was aware of or had agreed to. Trial Tr. at 331–32; DX D–3 at 26. When Barton was fired, the Kleimans stopped funding the operation. DX Z at 6, 13–15; DX Z–1 at 35.

In July 1991, INI stopped paying rent at its Water Street location and did not pay rent for each month thereafter through January 1992, at which time the landlord commenced an eviction proceeding against INI. DX G. INI settled the eviction proceeding by giving up the Water Street location in exchange for a release from further liability under its lease. Trial Tr. at 582. Similarly, INI failed to meet the minimum rentals required under the lease for its Maiden Lane facility, and the landlord terminated the lease in mid–1992. Trial Tr. at 583. In 1992, INI ceased operating both its airline CTOs and has not operated any airline CTOs since that time.

## III. Barton's Time With Albert Young

### A. The Relationship

On or about August 1, 1991, Barton and Albert Young executed a Consulting Agreement pursuant to which Barton was to act as a consultant in connection with the establishment of CTOs in the United States and Europe. JPTO ¶ 5(p); PX 19. Prior to executing the Consulting Agreement, however, Albert Young received and had the opportunity to read the Shareholders Agreement. JPTO ¶ 5(s); PX 2. Albert Young also received and read the Employment Agreement between Barton and INI. JPTO ¶ 5(t); PX 1. Albert Young paid Barton over $37,500 pursuant to the Consulting Agreement, as well as $12,500 as a "final" and full payment under the Consulting Agreement. JPTO ¶ 5(u).

On or about August 22, 1991 Steven Kleiman, David Kleiman, Barton, his attorney Alan Snyder, and two private investigators hired by INI attended a meeting at INI's office. The meeting was videotaped without the knowledge of Barton or his attorney. JPTO ¶¶ 5(w), 5(x). At the videotaped meeting, the Kleimans stated several times that Barton had destroyed their business and that they wanted their money back.

On or about October 1, 1991, Albert Young received a letter from INI's attorney concerning Barton. JPTO ¶ 5(dd); PX 21. On or about October 4, 1991, Albert Young and William Young responded to this letter by having their attorney send a letter to INI's attorney. JPTO ¶ 5(ee); PX 22.

Albert Young had concerns about Barton's trustworthiness and integrity. JPTO ¶ 5(y). Accordingly, Barton was given an office at 100 East 42nd Street in New York City, that was physically separate from Albert Young's primary office at 110 East 59th Street. Barton was not provided with a secretary, stationery, typewriter or word processor at this office, and was instructed not to correspond directly with any of Albert Young's clients. JPTO ¶ 5(z), (aa), (bb).

Barton did much of the work in opening the Satellite Orlando Facility. JPTO ¶ 5(cc). The Satellite Defendants opened the Orlando Facility in or about November 1991. Barton also provided Albert Young with a written analysis of prospective CTOs. JPTO ¶ 5(r); PX 29. On or about January 30, 1992, while still employed by the Satellite Defendants, unbeknown to them, Barton formed a new corporation for the purpose of developing and operating CTOs. DX M. Barton continued working under the Consulting Agreement until on or about March 12, 1992, when he was fired. PX 85. After Barton left the Satellite Defendants, Continental Airlines entered into an agreement with the Satellite Defendants for the occupancy of CTOs in Orlando, Paramus, New Jersey and 100 East 42nd Street in New York.

### B. The Orlando Floor Plan

In or about August, 1991, Satellite of Orlando, Inc. was formed. At some point after the Consulting Agreement was executed, a sticker with the designation "Satellite Airlines Ticket Center, Inc." was placed over the INI title block on the INI Orlando Floor Plan; JPTO ¶ 5(jj); PX 34. William Young made copies of this modified floor plan. Proposed license agreements for the Satellite Orlando Facility, including a copy of the Satellite stickered INI Orlando Floor Plan were sent to: (1) Steve Cossette of Continental Airlines on or about August 8, 1991; (2) Gordon Tolbert of Northwest Airlines on or about August 8, 1991; (3) Joe DiVincenzo of Trans World Airlines on or about August 8, 1991 and October 17, 1991; (4) Virgin Airways, on or about September 3, 1991; (5)

Iberia International Airways on or about October 7, 1991; (6) Lufthansa Airlines on or about October 7, 1991; (7) Mears Airport Shuttle Service on or about October 7, 1991; (8) Americash on or about October 20, 1991; (9) Jane Pizzi of Thomas Cook Currency; (10) National Car Rental on or about November 27, 1991; and (11) Continental Airlines on or about July 13, 1992. JPTO ¶ 5(mm).

On or about April 12, 1993, more than one year after this action was commenced, William Young made and distributed copies of the Orlando Floor Plan with the name "The Satellite Companies" in the lower right hand corner to more than fifteen companies, JPTO ¶ 5(mm); PX 47, including airlines that flew through the Orlando airport and other southern-based airlines. JPTO ¶ (nn).

## CONCLUSIONS OF LAW

### I. Copyright Infringement

#### A. Statutory Damages

In its January 4, 1995 Memorandum Opinion and Order, the Court found that INI had a valid copyright in the INI Orlando Floor Plan and the 32mm Insert System (collectively, the "Plans"). *See Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F.Supp. 709, 721 (S.D.N.Y.1995). In addition, the Court found that INI had demonstrated that the Satellite Defendants copied the INI Orlando Floor Plan and thus granted INI summary judgment with respect to liability, but denied INI's motion for summary judgment with respect to the 32mm Insert System. *Id.* at 732. The Satellite Defendants presently claim that INI is entitled to neither statutory nor actual damages based on such copying.

 Title 17, United States Code Section 412 states:

In any action under this title, other than an action instituted under section 411(b), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412. It is clear from both the wording and legislative history of Section 412 that statutory damages may not be awarded even if infringement, originally commenced before registration, continues after registration. *Singh v. Famous Overseas, Inc.*, 680 F.Supp. 533, 535–36 (E.D.N.Y.1988); *Mason v. Montgomery Data, Inc.*, 741 F.Supp. 1282, 1285 (S.D.Tex.1990) ("Where the alleged infringing activity commences prior to the registration of a copyright, the copyright claimant may not claim statutory damages for continued post-registration activity."); *Johnson v. University of Virginia*, 606 F.Supp. 321, 324–25 (D.Va.1985) (same).

 Here, INI acknowledges that the Satellite Defendants commenced copying the Plans and mailing them to various prospective tenants beginning in August 1991, Trial Tr. at 8, 122; PX 36–46, approximately six months before the copyright registration was filed in February 1992. Thus, publication commenced prior to filing the copyright registration. In addition, INI failed to comply with the requirement that a registration be filed within three months of the first publication of the Plans. Accordingly, the application of statutory damages would be inappropriate.

The Court finds without merit INI's argument that because Satellite of Orlando, Inc. did not exist when Albert Young, William Young and Satellite Airline Ticket Centers, Inc. began copying the Plans, publication by Satellite of Orlando, Inc. was not commenced prior to registration. Satellite of Orlando, Inc. was organized in August 1991, Trial Tr. at 8, and several mailings were made between that date and February 1992, when the copyright registration was filed, *see* PX 35–45. The Court finds that these mailings were made by and on behalf of Satellite of Orlando, Inc. Thus, infringement by Satellite

of Orlando, Inc. commenced prior to registration, within the meaning of Section 412.[3]

## B. Actual Damages and Profits

In addition to statutory damages, INI claims that it is entitled to approximately $1 million based on the Satellite Defendant's copying of the one-page floor plan and the 32mm Insert System.

■ It is well established that the construction of a structure does not itself constitute copyright infringement of plans. *Demetriades v. Kaufmann*, 680 F.Supp. 658, 664 (S.D.N.Y.1988); *Muller v. Triborough Bridge Authority*, 43 F.Supp. 298, 299 (S.D.N.Y. 1942). Construction may be appropriately considered in the computation of damages, however, where the infringing plans were used to build the facility. *Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 280 (6th Cir.1988) ("[O]ne may construct a house which is identical to a house depicted in copyrighted architectural plans, but one may not directly copy those plans and then use the infringing copy to construct the house."); *see also Intown Enters., Inc. v. Barnes*, 721 F.Supp. 1263, 1266–67 (N.D.Ga. 1989) (same).

Accordingly, the proper measure of damages includes the profits INI would have made on CTOs it would have sold but for Barton's unauthorized duplication of INI's plans and the Satellite Defendants' use of its infringing copies to build its CTOs, *see Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d at 281, as well as "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b).

### 1. Satellite's Profits

■ INI asserts that the Satellite Defendants used the INI Orlando Floor Plan in the construction and marketing of the Satellite Orlando Facility. Defendants admit that the INI Orlando Floor Plan was used in the construction of the Orlando Facility, Plaintiff's First Request for Admissions, §§ 177–

78, PX 212, but claim, however, that the Orlando Floor Plan was not supplied by Albert Young or the Satellite Defendants. David Kleiman testified that a copy of the INI Orlando Floor Plan was sent by INI to the Orlando property owner's architect, Blakesley Design ("Blakesley"), long before Barton's employment was terminated. Trial Tr. at 392–93. Blakesley was then to prepare architectural drawings for submission to the local building department for approval, and to be used for construction of the Orlando Facility. Trial Tr. at 400–01. David Kleiman conceded that INI does not assert "that the way the landlord got this floor plan in order to build the facility was getting it from Albert Young." Trial Tr. at 401. The Court finds that INI has failed to demonstrate that the construction of the Orlando Facility involved any infringing copy of the Orlando Floor Plan, and thus is not entitled to damages based on such construction.

■ INI also maintains that it is entitled to the Satellite Defendants' profits resulting from the distribution of the Orlando Floor Plan to prospective customers for the purpose of designating counter locations. That is, INI contends that USAir, United Airlines and Continental Airlines rented counters in Orlando and Continental Airlines rented counters in Paramus, New Jersey and Grand Central on the basis of the Orlando Floor Plan, showing merely the location of counters. This allegation defies logic, and is without support in the record.

The weight of the credible evidence demonstrates that United, USAir and Continental Airlines had long-standing relationships with the Satellite Defendants and Albert Young spanning Young's approximately twenty-five years in the business. Trial Tr. at 805–08. In addition, each of these carriers occupied more than one of Satellite's facilities. Trial Tr. at 808. Barton testified that the idea for opening a facility in Orlando came from United Airlines itself, suggesting that its decision to occupy the facility was already made before it received the INI Orlando Floor Plan. Trial Tr. at 40. Further-

---

**3.** Since Section 412's prohibition against statutory damages for copyright infringement commenced prior to registration applies to attorneys' fees as well, INI's request for attorneys' fees is denied. *See* 17 U.S.C. § 412.

more, Linda Crevelt, Continental Airlines' regional manager for properties and facilities at the time the decision was made to occupy the Orlando Facility, testified that floor plans play no role in Continental Airlines' decision to occupy a particular facility, Trial Tr. at 784, and that Continental Airlines' Paramus, Grand Central and Orlando locations were "independent locations" and were not negotiated as a "package," Trial Tr. at 782, 793. Finally, the evidence advanced at trial demonstrates that Satellite Defendants never made a profit from the Orlando Facility. DX Q. Thus, INI has failed to establish that defendants enjoyed profits "attributable to the infringement."

### 2. INI's Losses

In the alternative, INI contends that it is entitled to its losses resulting from the Satellite Defendants' copyright infringement. Specifically, INI claims that the Satellite Defendants used an infringing copy of the Orlando Floor Plan to build the Orlando Facility, and had INI itself built the Orlando Facility it would have generated significant profits. As discussed above, however, the Court finds that INI has not established that infringing copies of the Plans were used in the construction of the Orlando Facility. Thus, the Court finds that INI is not entitled to damages resulting from losses from the Satellite Defendants' copying of the INI Orlando Floor Plan.[4]

## II. Lanham Act

### A. Reverse Palming Off

■ Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125, provides in part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, of any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the

affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is, or is likely to be damaged by such act.

15 U.S.C. § 1125. One of the deceptive practices actionable under Section 43(a) is a form of false designation of origin known as "reverse palming off." In reverse palming off, a defendant sells plaintiff's products as its own. *See, e.g., Sims v. Blanchris*, 648 F.Supp. 480, 482 (S.D.N.Y.1986) (phonograph record album creating the false impression that defendant rather than plaintiff was the principal performer constitutes reverse palming off under Section 43(a)); *Smith v. Montoro*, 648 F.2d 602, 607 (9th Cir.1981) (removing plaintiff film actor's name from all credits and advertisements for film in which he appeared and substituting a name of defendants' choosing constitutes reverse palming off under Section 43(a)).

■ Here, INI has failed to introduce any evidence that any airline or other prospective tenant of the Orlando Facility was confused as to the origin or authorship of the INI Orlando Floor Plan. In fact, Linda Crevelt ("Crevelt"), Continental Airlines' regional manager for properties and facilities, testified that such space plans did not play any role in Continental Airlines' decision to occupy a particular facility. Trial Tr. at 783–84. Furthermore, Crevelt testified that the placement of the Satellite sticker in the corner of the document did not indicate that the Satellite Defendants authored the document because it is standard practice to modify such documents merely "to illustrate the space" in question. Trial Tr. at 784.

■ Similarly, INI's claim that utilizing the Standard License Agreement constituted reverse palming off is without merit. Again, INI has presented no evidence of confusion as to the origin or authorship of the docu-

---

4. Because the Court declines to award INI damages on its copyright claims, the Court does not reach the issue of prejudgment interest.

ment. Furthermore, as Crevelt testified, such agreements are no more than standard "boilerplate" agreements which are commonly used and adapted in a variety of business transactions. Trial Tr. at 782.

## B. Trade Dress Infringement

 Trade dress is "the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to consumers." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir.1995). In order to be eligible for protection under Section 43(a), a plaintiff must show "(a) that its trade dress is entitled to protection under the Act, and (b) that the defendant's dress infringes on the plaintiff's dress by creating a likelihood of confusion." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 377 (2d Cir.1997). To be entitled to protection under the Act, plaintiff's trade dress must either be inherently distinctive or be shown to have acquired distinctiveness through "secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 774, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992); *EFS Marketing, Inc. v. Russ Berrie & Co.,* 76 F.3d 487, 490 (2d Cir.1996). In the event the plaintiff demonstrates that it is entitled to protection, the defendant can still avoid liability by showing that "the similar arrangement of features is functional." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 377 (2d Cir.1997) (quoting *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987)).

Although most courts have held that proof of a mere likelihood of confusion is sufficient to obtain injunctive relief for unfair competition under Section 43(a), it has generally been held that proof of actual confusion is required to obtain a damages remedy. *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.,* 747 F.2d 81, 93 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981); *Skil Corp. v. Rockwell Int'l Corp.,* 375 F.Supp. 777, 783 (N.D.Ill.1974).

 Here, INI has offered no evidence describing the elements of its trade dress. Furthermore, INI has failed to establish that its alleged trade dress has a consistent look or has acquired a secondary meaning in the marketplace by which it is identified with INI. Rather, INI asserts generally that the appearance of the Orlando Facility as designed by INI is trade dress protected by Section 43(a). INI claims that although the appearance of the Orlando Facility is one of many "concrete expressions" of how a CTO should look, the Satellite Defendants chose to use INI's design. INI further claims that the trade dress of the Orlando Facility is both inherently distinctive, because it suggests the ticket counters at an airport, and has acquired secondary meaning. Finally, INI claims that there was actual confusion. These allegations are wholly unsupported by the record.

First, INI's contention that its trade dress is "inherently distinctive" because "it suggests the ticket counters at an airport," see Pls.' Proposed Conclusions of Law ¶ 14, does not withstand scrutiny. A facility that emulates the look and feel of ticket counters at any airport is common or generic, and not inherently distinctive. *See* Trial Tr. at 404–05.

Second, INI asserts that both the general public and the airlines were confused as to the origin of Satellite's allegedly infringing facilities. With respect to the public, INI does not offer evidence to support a claim of confusion. Moreover, David Kleiman expressly testified that such a claim would be "absurd," and that INI would not make any such claim. Trial Tr. at 407–08. As to the airlines, David Kleiman testified during his deposition as follows:

Q. How about Orlando? Can you name a single airline or member of the public that believes that the Orlando ticket office is being operated by INI rather than Satellite?

A. Since Mr. Barton has left Satellite, I don't believe there is anyone, no.

DX X at 672–73.[5] In addition, David Kleiman testified at trial that when airlines

---

**5.** Similarly, Leonard Kleiman testified during his deposition:

signed a lease with INI they knew that they were dealing with INI, and they knew this not by looking at the cabinets or the 32mm Insert System, but through the course of dealing with INI and through signing license agreements which clearly identified INI. Trial Tr. at 403–04.

Finally, INI's assertion that Duff of United Airlines was confused as to who was involved in the construction of the Orlando Facility is inconsistent with the above testimony. In any event, David Kleiman testified that Duff told him that "there was an effort made to duplicate [plaintiff's] system." DX X at 217. This suggests that Duff was aware that someone other than INI was building the Orlando Facility.

Because the evidence adduced does not demonstrate Lanham Act violations or that INI has suffered actual damages from any conduct on the part of the Satellite Defendants, *see Aktiebolaget Electrolux v. Armatron Int'l, Inc.,* 829 F.Supp. 458, 467 (D.Mass.1992), *aff'd,* 999 F.2d 1 (1st Cir. 1993), the Court denies INI's request for damages for reverse palming off and trade dress infringement.

## III. Tortious Interference with Contract

INI asserts a claim for tortious interference with contractual relations based on the alleged procurement by the Satellite Defendants of a breach of a restrictive covenant in Barton's Employment Agreement with INI. In order to establish a claim for tortious interference with contract, INI must prove: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's intentional procurement of a breach of contract by the third party; and (3) damages caused by the breach. *Nordic Bank PLC v. Trend Group, Ltd.,* 619 F.Supp. 542, 560–61 (S.D.N.Y.1985).

### A. The Existence of a Valid Contract

Barton and INI entered into the Employment Agreement on August 14, 1989. JPTO ¶ 5(i); *see* PX 1 ¶ 2. INI contends that its

Q. Do you claim that customers of Satellite signing license agreements with Satellite are led to believe that in fact they are dealing with someone other than Satellite?

Employment Agreement with Barton was extended beyond its initial term of six months through the termination of Barton's employment on July 24, 1991. Thus, INI argues that the restrictive covenant prohibiting Barton's participation in a similar or competing business for a period of twelve months after termination of employment was violated by Barton's Consulting Agreement with Albert Young, formed on August 1, 1991. INI claims that the Satellite Defendants are liable for this breach. The Satellite Defendants argue that the extension of the restrictive covenant beyond the term explicitly included in the Employment Agreement violates the Statute of Frauds because there was no intent that the restrictive covenant be extended beyond the original term of the Employment Agreement, ending January 31, 1990.

Where the original term of an employment contract is for more than one year, the Statute of Frauds precludes renewal for the full period of the original term absent a written agreement. See N.Y. Gen. Oblig. Law § 5–701(a)(1) (McKinney 1989). While the continuance of employment supports a presumption of renewal of the Employment Agreement in one year increments, whether the restrictive covenant remains in effect "depends on the intent of the parties as evidenced largely by the language of the written agreement." *Thur v. IPCO Corp.,* 173 A.D.2d 344, 345–46, 569 N.Y.S.2d 713, 715 (N.Y.App.Div.1991); *see also Borne Chem. Co. v. Dictrow,* 85 A.D.2d 646, 648, 445 N.Y.S.2d 406, 411 (N.Y.App.Div.1981) ("Where the original term of an employment contract is for more than one year, a continuance in employment will not, because of the Statute of Frauds, support a presumption of renewal for the full period of the original term.... The presumption is one of fact and may be rebutted."); *Hubbell v. Hubbell Highway Signs, Inc.,* 72 A.D.2d 923, 924, 422 N.Y.S.2d 199, 201 (N.Y.App.Div.1979) (covenant not to compete not impliedly read into employment contract because would violate Statute of Frauds).

A. Don't be foolish. Of course not. DX Z at 80.

■ For Statute of Frauds purposes, Barton's original Employment Agreement was for more than one year. The term of the Employment Agreement was six months, plus the restrictive covenant that was to last for twelve months after the termination of employment. The Employment Agreement was capable of being fully performed within eighteen months. A non-written renewal of this contract would violate the Statute of Frauds because it would not be capable of being fully performed within one year. Nevertheless, in its January 1995 Order, the Court offered the parties an opportunity to present evidence on the issue of intent with respect to the extension of the restrictive covenant. *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F.Supp. at 728. This Court found that "an issue of fact exists as to whether the parties intended that the restrictive covenant provision be extended beyond the original term of the contract." *Id.* The only evidence adduced at trial with respect to this issue was that prior to signing a letter of intent in anticipation of the Employment Agreement, Barton and David Kleiman discussed and agreed that the restrictive covenant would start to run upon the termination of Barton's employment. Trial Tr. at 27–29; 225–27. No credible evidence was presented during trial demonstrating the parties' intent to renew the restrictive covenant at the end of the term of the original Employment Agreement.

Therefore, despite the fact that Barton continued to render substantially the same services to INI between January 31, 1990 and July 24, 1991 that had been rendered during the original term of the Employment Agreement, there has been no showing that the parties intended the restrictive covenant to renew itself under the same terms and conditions that existed during the original term. Therefore, the Court finds that the restrictive covenant violates the Statute of Frauds and is unenforceable.

### B. Satellite Defendants' Intentional Procurement of Breach

Even assuming that the Employment Agreement was renewed and enforceable, INI's claim of tortious interference with Barton's contract fails for the independent reason that INI has not shown that the Satellite Defendants intentionally procured the breach.

■ To prove intentional procurement of a breach of contract, plaintiff must show "that 'there would not have been a breach but for the activities of defendants.'" *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir.1990), *cert. denied*, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991) (quoting *Special Event Entertainment v. Rockefeller Ctr., Inc.*, 458 F.Supp. 72, 78 (S.D.N.Y.1978)).

■ The Court finds that INI has failed to establish that Barton's breach of the restrictive covenant provision would not have occurred but for the defendants' conduct. The credible evidence adduced at trial demonstrates that Barton's business was opening business retail centers. At Phonex, INI, Satellite and on his own, Barton made a career of establishing business centers for the use of multiple retailers. Even Leonard Kleiman, a principal of INI, acknowledged that had Barton not gone to work for the Albert Young, he would have remained in the business, as a competitor of INI. See DX Z at 193–94. Therefore, INI has not offered sufficient evidence demonstrating that but for the Satellite Defendants actions, Barton would not have competed with INI in the CTO business.

### IV. Unfair Competition

■ INI asserts a claim for unfair competition based on the alleged misappropriation of documents by Barton. "An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Export Co. v. Columbia Broadcasting Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *see also Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.*, 678 F.Supp. 424, 429 (S.D.N.Y.1987) (the essence of a claim for unfair competition is "the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as

to the origin of goods"). The unauthorized physical taking and exploitation of internal company documents for use in a competitor's business constitutes unfair competition. *Ecolab Inc. v. Paolo*, 753 F.Supp. 1100, 1111 (E.D.N.Y.1991); *see also Continental Dynamics Corp. v. Kanter*, 64 A.D.2d 975, 408 N.Y.S.2d 801, 802 (N.Y.App.Div.1978) (even where an employee's physical taking of an employer's customer lists does not rise to the level of trade secrets, it may nevertheless constitute unfair competition).

INI contends that the Satellite Defendants' use of INI's (1) draft lease agreement; (2) Standard License Agreement; (3) contract proposals; (4) rolodexes; and (5) Orlando Floor Plan constitutes unfair competition and misappropriation. This Court has previously held that INI's claim for unfair competition with respect to the INI Orlando Floor Plan is preempted by federal copyright laws. *See Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F.Supp. at 730–31. With respect to the other documents, evidence was presented to the Court on three issues: (1) whether Barton took documents with him when he left employment at INI; (2) whether the Satellite Defendants used these documents; and (3) whether the documents contained any confidential or proprietary information not readily available from other sources.

### A. Draft Lease Agreement, Standard License Agreement and Contract Proposals

■ Even assuming that the draft lease agreement, Standard License Agreement and contract proposals were taken by Barton and obtained and used by the Satellite Defendants, INI's claim still fails because these documents did not contain any confidential or proprietary information. The weight of the credible evidence demonstrates that all ·of these documents had been distributed publicly. None of these documents were internal to INI and the Satellite Defendants' use of them did not involve bad faith misappropriation of the labors and expenditures of INI. Nor was the Satellite Defendants' use of INI-created documents likely to cause confu-

sion or to deceive purchasers as to the origin of the goods.

### B. Rolodexes

During the course of Barton's employ at INI, he developed two rolodexes containing cards with the contacts that he had developed over the two years. Barton took those rolodexes with him after he was fired from INI and maintained them during his time with the Satellite Defendants. INI alleges that this was a taking of information constituting unfair competition.

■ If a plaintiff demonstrates the unauthorized taking and exploitation of an employer's confidential customer information by an employee, he may assert a claim for unfair competition. *Hancock v. Essential Resources, Inc.*, 792 F.Supp. 924, 927 (S.D.N.Y.1992). However, there is no general rule classifying information acquired over years of employment as confidential to the employer. *See Clark Paper & Mfg. Co. v. Stenacher*, 236 N.Y. 312, 317, 140 N.E. 708, 710 (1923). A customer list is not entitled to judicial protection if the information on it is readily ascertainable. *See Advanced Magnification Instruments of Oneonta v. Minuteman Optical Corp.*, 135 A.D.2d 889, 522 N.Y.S.2d 287 (N.Y.App.Div.1987) (a customer list is entitled to judicial protection where it is clearly confidential; part of misappropriators' duties were to collect and shred printouts of the master list); *American Printing Converters v. JES Label & Tape*, 103 A.D.2d 787, 788, 477 N.Y.S.2d 660, 662 (N.Y.App.Div. 1984) (absent proof that customer names on list are not otherwise ascertainable, the list is not protected).

■ The evidence adduced at trial shows that Barton was hired by INI precisely because he had experience opening business retailing centers. While at INI, he developed contacts among airlines and associated services; those contacts were carried with him when he left employ with INI. The Court finds that the rolodexes were not a confidential customer list. Rather, based on common sense and the testimony at trial, the Court finds that the information in the rolodexes was readily ascertainable. Only a limited universe of companies were appropriate

tenants for the CTOs, and the names of these companies were readily ascertainable by both the Satellite Defendants and INI without using Barton's rolodexes. Furthermore, the evidence does not show that the Satellite Defendants poached INI's customers by using the rolodexes. INI alleges that Barton was able to place United Airlines, USAir, Continental Airlines, DHL Packaging Services and Thomas Cook into Satellite facilities through contacts he developed while at INI. No evidence has been presented that demonstrates that had the rolodexes been left at INI, Barton would not have been able to accomplish the same placements. The Court will not deny Barton the ability to carry his contacts with him simply because he chose to memorialize in writing the names and phone numbers of those contacts. Accordingly, the Satellite Defendants are not liable for unfair competition based on Barton's use of his rolodexes while employed by Albert Young.

Other than the draft lease agreement, Standard License Agreement, contract proposals and the rolodex, INI has not presented any evidence that Barton misappropriated documents from INI. INI has failed to show that confidential or proprietary information was contained in the documents allegedly taken by Barton and utilized by the Satellite Defendants. Accordingly, based on the credible weight of the evidence, the Court finds that the Satellite Defendants did not misappropriate from or unfairly compete with INI. The Court also finds INI's claim of unfair competition based on the alleged palming off to be without merit, for all of the reasons set forth above.

## V. Breach of Fiduciary Duty

 INI contends that the Satellite Defendants participated in and induced Barton's breach of his fiduciary duties as an officer, director and shareholder of the company at various times. The elements of a claim for inducing or participating in a breach of fiduciary duty are: (1) a breach by a fiduciary of obligations to another; (2) that the defendant knowingly induced or participated in the breach; and (3) that the plaintiff suffered damages as a result of the breach. *S & K*

*Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847 (2d Cir.1987). For the following reasons, the Court finds that Barton breached his fiduciary duty to INI as a director of the corporation, but that INI did not suffer any damages as a result of the breach.

### A. Fiduciary Duties

 As an officer and director of INI, Barton had a duty of loyalty to INI. *Duane Jones Co. v. Burke*, 306 N.Y. 172, 187, 117 N.E.2d 237, 245 (1954). The specific contours of this duty are elusive. *Weiss/Watson, Inc. v. Lange*, No. 87 Civ. 0032, 1990 WL 33601, at *2 (S.D.N.Y. March 21, 1990). However, it is clear that Barton was required "to exercise the utmost good faith and loyalty in the performance of his duties." *See Duane Jones v. Burke*, 306 N.Y. at 188, 117 N.E.2d at 245.

 Furthermore, shareholders of a close corporation share a fiduciary duty among themselves. *Benson v. RMJ Securities Corp.*, 683 F.Supp. 359, 374 (S.D.N.Y. 1988); *Fender v. Prescott*, 101 A.D.2d 418, 422, 476 N.Y.S.2d 128, 132 (N.Y.App.Div. 1984). INI alleges that Barton, as a shareholder and director of a close corporation violated his fiduciary duties to INI after his termination. INI alleges that Barton failed to meet this standard by turning over INI documents to the Satellite Defendants on a number of occasions prior to the termination of his employment by INI. Satellite Defendants maintain, however, that Barton's status as shareholder and director ended upon the termination of his employment, pursuant to the Shareholder Agreement. *See* PX 2 ¶ 3.7.

### 1. Pre–Termination Breach of Fiduciary Duty by Barton as Officer and Director of INI

 Barton met with Young on a number of occasions prior to Barton's termination by INI, during which they discussed a possible merger between INI and the Satellite Defendants. No confidential documents were exchanged at those meetings, no attempt was made by Young to induce the separation of Barton from INI, and there were no discussions regarding the establishment of a competing company. Although INI presented

testimony that Barton turned over documents to the Satellite Defendants during these meetings, INI has simply failed to show by the weight of the credible evidence that Barton breached a fiduciary duty to INI through his meetings with the Satellite Defendants. The more credible testimony demonstrates that no confidential documents were turned over during the meetings.

INI also alleges that Barton was fired because he embezzled more than $60,000 from INI, forged and altered leases and granted greater concessions than INI was aware of or had agreed to. Trial Tr. at 331–32; DX D–3 at 26. Even assuming the truth of these allegations, INI presented no evidence demonstrating that the Satellite Defendants induced or participated in this conduct. For these reasons, the Satellite Defendants did not participate in or induce a breach of any fiduciary duty that Barton may have had or breached during the course of his employment by INI.

### 2. Post–Employment Breach of Fiduciary Duty as Shareholder

■ The credible weight of the evidence demonstrates that Barton did not owe a shareholder's fiduciary duty to INI after his termination because he was no longer a shareholder. Therefore, the Satellite Defendants did not participate or induce a breach of a shareholder's fiduciary duty.

Barton ceased to be a shareholder of INI on July 24, 1991, the date his employment was terminated. See PX 49. At the time of Barton's termination, his shares were offered to INI for sale and the offer was accepted by INI pursuant to the Shareholders Agreement. See PX 2. At the same time, Barton was terminated as a director. See PX 2 ¶ 3.2(d); DX Z at 12. Therefore, Barton was neither a shareholder nor director of INI subsequent to his termination, and therefore owed no fiduciary duty to INI in either capacity after July 24, 1991.

INI argues that because Barton was under a contractual obligation to offer his shares for sale, he also owed a fiduciary duty to INI after his termination and during the period of this contractual obligation. INI relies on Barton's subjective understanding that he re-mained a shareholder after his termination. See Trial Tr. at 173. However, the evidence presented to the Court did not establish that Barton met the contractual requirements of electing to defer the purchase of his shares beyond the date of his termination, as required by the terms of the Shareholder Agreement. See PX 10 ¶ 3.7. Therefore, the Court finds that the transfer took place on July 24, 1991, at which time Barton ceased to be a shareholder.

### 3. Post–Employment Breach of Fiduciary Duty as Director

The Court finds that Barton was a director of INI, even after the termination of his employment and the sale of his shares. The weight of the evidence shows that Barton was appointed as a director of INI upon the execution of the Shareholder Agreement. No evidence was presented to rebut his continuing status as a director, such as evidence that he resigned or was removed as a director.

■ A director acting in good faith is not precluded from participating in a business similar to that of his corporation, but he must not act so as to cripple or injure the corporation. If he does, he is answerable for damages the company sustains because of that conduct. Bertoni v. Catucci, 117 A.D.2d 892, 894, 498 N.Y.S.2d 902, 904 (N.Y.App.Div. 1986). Based on its findings with respect to liability on Count One, the Court concludes that Barton breached his fiduciary duty to INI by copying the INI Orlando Floor Plan in violation of copyright laws. The Court finds no other breach of Barton's fiduciary duty as a director of INI.

■ Assuming, arguendo, that the Satellite Defendants had sufficient knowledge of Barton's continuing status as a fiduciary of INI and that they participated in the breach of Barton's duties by employing him, the Court nonetheless finds that INI suffered no damages. INI claims that it is entitled to the higher of its loss or the Satellite Defendants' gain for the procurement of a breach of Barton's fiduciary duties. As stated above, the evidence advanced at trial demonstrates that the Satellite Defendants' never

made a profit from the Orlando Facility. Thus, INI has failed to establish that the defendants had profits attributable to the breach of Barton's fiduciary duties. Alternatively, INI contends that had it built the Orlando Facility itself, it would have generated significant profits. The Court does not find evidence to support this argument. Rather, the evidence adduced at trial shows that INI was not prepared to build the Orlando Facility, but was simply postponing the project in an effort to gather enough firm commitments to go forward with the site. Trial Tr. at 641, 644, 648. Furthermore, because the copied Orlando Floor Plan that forms the basis of the breach of the fiduciary duty was not used in the construction of the facility and because it is not clear that the Orlando Floor Plan played any role in retailers' decisions to operate a particular facility, see, Trial Tr. at 782, 793, INI is not entitled to damages resulting from losses from the Satellite Defendant's copying of the Orlando Floor Plan. Despite INI's contentions, the credible evidence does not show that the destruction of INI's business is attributable to Barton's breach of his fiduciary duty with respect to the Orlando Floor Plan.[6]

## CONCLUSION

For the reasons set forth above, the Court finds that the Satellite Defendants infringed INI's copyright for the Orlando Floor Plan and participated in the breach of Barton's fiduciary duties as a director of INI. However, the Court finds that INI is entitled to no damages. Accordingly, judgment is entered for the plaintiff on Counts One and Five, and no damages are awarded.

SO ORDERED.

6. Because the Court has found that the Satellite Defendants are not liable for any damages, it is not necessary to reach the merits of their third-party claim against Barton for indemnification.