**MICHELE POMMIER MODELS, INC., Plaintiff,**

v.

**MEN WOMEN NY MODEL MANAGEMENT, INC., Defendant.**

**MEN WOMEN NY MODEL MANAGEMENT, INC., Third Party Plaintiff,**

v.

**Elsa Benitez YANEZ and Samuel Burstyn, Third Party Defendants.**

**No. 97 Civ. 6837 (SAS).**

United States District Court, S.D. New York.

July 8, 1998.

Stuart E. Abrams, Sandor Frankel, Frankel & Abrams, New York City, for Plaintiff Michele Pommier Models, Inc.

Gerald E. Singleton, Frankfurt, Garbus, Klein & Selz, P.C., New York City, for Defendant Men Women N.Y. Model Management, Inc.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Michele Pommier Models, Inc. ("Pommier"), a Florida-based modeling agency, filed this action alleging that defendant Men Women N.Y. Model Management, Inc. ("WMM") interfered with Pommier's exclusive model representation contract with Elsa Benitez Yanez ("Elsa"), an internationally known fashion model. Pommier asserts claims for (1) tortious interference with contract, (2) unfair competition, and (3) unjust enrichment, and seeks to recover exemplary and punitive damages. This Court previously denied WMM's 12(b)(6) motion, *Michele Pommier Models, Inc. v. Men Women N.Y. Model Management, Inc.*, 97 Civ. 6837, 1997 WL 724575 (S.D.N.Y. Nov.18, 1997), and denied Pommier's motion for a preliminary injunction. *See* Transcript of Proceedings of September 25, 1997. Defendant now moves for summary judgment on the Amended Complaint, pursuant to Fed.R.Civ.P. 56. Defendant's motion is granted with respect to all three of Pommier's claims.

## I. Summary of Facts

This action arises out of two model management services contracts: a 1996 agency agreement between Pommier and Elsa (the "Florida contract") and a 1997 settlement agreement of an action between Pommier, Elsa, and Elite Model Management, Inc. ("Elite"), a New York modeling agency (the "New York contract").

### A. The Florida Contract

On May 8, 1996, Pommier signed Elsa to a five-year exclusive agency contract, which provided that Pommier would act as Elsa's exclusive representative in the modeling industry and would receive a 25 percent commission on Elsa's gross earnings as a model. *See* Affidavit of Gerald E. Singleton ("Singleton Aff. 1"), attorney for WMM, dated April 22, 1998, Exh. 1 at ¶¶ 7, 10 (Pommier–Elsa contract). In addition, the contract included a restrictive covenant, which prohibited Elsa from employing any other representatives, managers, or agents without prior written consent from Pommier, and from accepting any modeling engagements except those booked by Pommier. *Id.* at ¶¶ 5(a), 5(b). On May 31, 1996, the contract was amended, reducing Pommier's commission to the industry standard of 20 percent. *Id.* at ¶ 7 addendum; Affidavit of Joseph Hunter, President of International Model Managers Association, dated August 27, 1997, at ¶ 4(c). While represented by Pommier, Elsa quickly became an extraordinarily successful model. As a result, she decided that she should be managed by a larger agency in New York City, the center of the U.S. modeling industry. *See* Third Party Complaint (filed by WMM against Elsa Benitez, seeking attorney's fees), Exh. 2 (letter from Elsa to Michele Pommier, President of Pommier Models).

### B. The New York Contract

On April 4, 1997, Elsa informed Pommier that she had agreed to be represented by Elite in New York, and that Elite was willing to enter into a commission-sharing agreement with Pommier. *Id.* In response, Pommier filed an action in this Court against Elite, and obtained a temporary restraining order prohibiting Elite from representing Elsa. On May 16, 1997, Pommier, Elite, and Elsa entered into an oral settlement agree-

ment which provided that Elite would pay Pommier a fixed percentage on the bookings it arranged for Elsa over a six year period. Furthermore, the agreement stated that if Elsa left Elite, any future modeling agency would be bound to compensate Pommier under the terms of the settlement agreement. Amended Complaint, Exh. 2 (transcript of court proceedings, May 16, 1997). Less than three weeks later, on June 6, 1997, Elite and Elsa notified the Court that they would not abide by the terms of the oral agreement. *See* Singleton Aff. 1, Exh. C (transcript of court proceedings, June 10, 1997).

### C. *Action for Nullification of the Florida Contract*

After repudiating the New York contract, Elsa filed an action on June 10, 1997 in Dade County, Florida, in which she sought to nullify her 1996 exclusive agency contract with Pommier. At about that time, Elsa began to refuse Pommier's bookings. *See* Affidavit of Gerald E. Singleton ("Singleton Aff. 2"), dated May 8, 1998, Exh. I. In a letter dated July 1, 1997, Elsa notified Pommier that she was terminating the Florida contract. Affidavit of Puaolo Buofonte, Pommier's booking agent, dated May 1, 1998, Exh. 1. Three weeks later, the Dade County court granted an order enjoining Pommier from representing Elsa and from holding itself out as Elsa's agent. Singleton Aff. 1, Exh. D (order of Dade County court). The court, however, reserved decision on whether the restrictive covenant, which prevented Elsa from hiring another agent, was enforceable.[1] In late November 1997, Pommier, Elite, and Elsa entered into a written settlement agreement releasing the parties from all contracts, as well as all claims each had or could have asserted against the others. *See* Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") at 5.

### D. *WMM's Representation of Elsa*

In June or early July 1997, Elsa's attorney, Samuel Burstyn ("Burstyn"), called Paul Rowland ("Rowland"), president of WMM, to ask whether WMM would be interested in representing Elsa. Affidavit of Stuart Abrams ("Abrams Aff."), Pommier's attorney, dated May 1, 1998, Exh. 7 at 30, 47 (Deposition of Paul Rowland); Affidavit of Paul Rowland ("Rowland Aff."), dated September 19, 1997, at ¶¶ 5, 6. Rowland responded that WMM would be interested. Abrams Aff., Exh. 7 at 35–38. This was the full extent of their conversation. *Id.* On July 8, 1997, Rowland and Burstyn reached an oral agreement that WMM would represent Elsa at a commission of 12 percent; the agreement was confirmed by fax later that day. *Id.* at Exh. 8. Less than a week later, on July 14, Elsa performed an editorial photo shoot for American Vogue Magazine, which was booked by WMM. *Id.* at Exh. 10. Shortly thereafter, WMM stopped accepting bookings for Elsa, because it became concerned that Pommier would sue. On September 2, after Elsa agreed to pay one-half of the legal fees and expenses arising from any litigation initiated by Pommier, WMM resumed booking Elsa. Rowland Aff. at ¶ 7; Singleton Aff. 1, Exh. 4; Abrams Aff., Exh. 15.

### E. *The Wesley Jessen Contact Lens Contract*

On June 26, 1997, one week before Elsa gave Pommier written notice that she was terminating the Florida contract, Will Steere of Ruder Finn, an advertising agency, called Pommier to inquire about Elsa's availability for an upcoming international contact lens campaign for Wesley Jessen products. That same day, Steere faxed Pommier an outline of the services needed, the anticipated extent of the ad campaign, and a request for a fee quote. *See* Affidavit of William Steere III ("Steere Aff."), Executive Vice President of Ruder Finn, dated April 22, 1998 at ¶ 3 and Exh. A (fax from Steere to Buofonte). When Steere later called Pommier to schedule an interview between Elsa and Wesley Jessen, he received no response. Steere then learned that WMM was representing Elsa, and on July 25, 1997, he faxed WMM a similar proposal for the Wesley Jessen cam-

---

[1] It is my understanding that this issue was never decided as the parties reached an amicable settlement.

paign with a request for fee quotes. *Id.* at ¶¶ 5, 6. WMM closed a lucrative deal between Elsa and Wesley Jessen in early September, 1997. *Id.* at ¶ 8. Elsa has since terminated her at-will relationship with WMM, and is now represented by Elite. *See* Def.'s Mem. at 5.

## II. Standard of Review—Summary Judgment

Under Rule 56(c), summary judgment shall be granted in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual issue is material if its resolution could affect the outcome of the dispute. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Converse v. General Motors Corp.,* 893 F.2d 513, 514 (2d Cir.1990). The burden of demonstrating that no factual dispute exists is on the moving party. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (1986); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). Once this burden has been met, the non-moving party must come forward with evidence that is more than "mere speculation and conjecture," *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990), but "would be sufficient to support a jury verdict in its favor." *Goenaga v. March Of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995).

For the purposes of summary judgment, the court must only determine whether issues exist to be tried, not try issues of fact itself. *See Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). The court must review the evidence in the light most favorable to the non-moving party, resolving all ambiguities and drawing all factual inferences in that party's favor. *See D'Amico v. City of New York,* 132 F.3d 145, 148 (2d Cir.1998). If there is evidence in the record from which a fair inference may be drawn in favor of the non-movant on a material issue of fact, summary judgment must be denied. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). But, if the evidence presented by the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas,* 143 F.3d 105 (2d Cir.1998)(quoting *Liberty Lobby,* 477 U.S. at 249–250, 106 S.Ct. 2505).

## III. Discussion

### A. Tortious Interference

 Pommier's primary claim is that WMM tortiously interfered with both the Florida and New York contracts by entering into a representation agreement with Elsa. Under New York law,[2] tortious interference with contract has four elements: (1) a valid contract between plaintiff and a third party; (2) defendant must have knowledge of that contract; (3) defendant must have induced the third party to breach the contract; and (4) damages resulting from the breach. *See Enercomp, Inc., v. McCorhill Publishing Inc.,* 873 F.2d 536, 541 (2d Cir.1989); *Museum Boutique Intercontinental, Ltd. v. Picasso,* 886 F.Supp. 1155, 1161–2 (S.D.N.Y.1995); *Click Model Management v. Williams,* 167 A.D.2d 279, 561 N.Y.S.2d 781, 782 (1st Dep't 1990) (citing *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956)). The inducement element requires the plaintiff to establish that but for the allegedly tortious conduct of the defendant, the third party would not have breached her contract. *See Sharma v. Skaarup Ship Management Corp.,* 916 F.2d 820, 828 (2d Cir.1990) ("A plaintiff must allege that there

---

**2.** Though Florida law may govern the interpretation of the Florida contract, neither party argued the choice of law issue, and both cited only New York authority. When no party discusses choice of law in a tortious interference claim, the parties are deemed to have acquiesced to the application of the law of the forum. *Keles v. Yale*

*University,* 889 F.Supp. 729, 733 (S.D.N.Y.1995); *see also Clarkson v. Shaheen,* 660 F.Supp. 506, 512 n. 4 (2d Cir.1981). Thus, with respect to plaintiff's claim for tortious interference with the Florida and New York contracts, it is assumed that New York law applies.

would not have been a breach but for the activities of the defendants."); *Innovative Networks Inc. v. Young,* 978 F.Supp. 167, 180 (S.D.N.Y.1997); *Bryce v. Wilde,* 39 A.D.2d 291, 333 N.Y.S.2d 614, 616 (3d Dep't), *aff'd,* 31 N.Y.2d 882, 340 N.Y.S.2d 185, 292 N.E.2d 320 (1972) ("[C]ourts have required more than a showing of qualified probability that the contract would have been completed but for the tortious interference.").

### 1. *The Pommier–Elsa Florida Contract*

Pommier contends that WMM interfered with both the exclusive agency provision and the restrictive covenant of the Florida contract. The claim fails because no reasonable juror could infer that WMM was the "but for" cause of Elsa's breach of either provision.

#### a) *The Exclusive Agency Provision*

It is uncontested that Elsa initiated contact with Paul Rowland at WMM through her attorney, Samuel Burstyn. In response to Burstyn's inquiry, Rowland indicated that WMM would indeed be interested in representing Elsa. Pommier asserts that WMM's expression of interest in representing Elsa raises an issue of material fact as to whether WMM induced Elsa to terminate the exclusive agency agreement on July 1, 1997.

■ Though the Burstyn–WMM conversation was initiated by Burstyn, it nonetheless could have been a cause of Elsa's breach of the agency agreement if, by assuring Elsa that WMM would represent her, WMM motivated Elsa to leave Pommier. However, on June 10, 1997, Elsa unequivocally manifested an intent to terminate the Florida contract by filing suit in Dade County court seeking to nullify that contract. Consequently, in order for WMM to have been the "but for" cause of Elsa's breach, the conversation between Burstyn and WMM would have had to occur *before* June 10. The only evidence proffered by Pommier regarding the timing of the initial conversation between Rowland and Burstyn is Rowland's deposition testimony, in which he states that Burstyn contacted

WMM sometime in June or July 1997. It follows as a matter of logic that no reasonable juror could conclude by a preponderance of the evidence that Burstyn contacted WMM in the *first ten days* of the month, i.e., before Elsa filed suit. Accordingly, plaintiff has failed to point to any evidence from which a juror could reasonably infer that WMM's conduct was the "but for" cause of Elsa's decision to terminate the Florida contract.

#### b) *The Restrictive Covenant Provision*

Pommier further argues that even if WMM did not induce Elsa to terminate the exclusive agency provision, Elsa remained bound by the contract's restrictive covenant after the agency provision was terminated.[3] If the restrictive covenant was still valid and enforceable, Pommier argues, then WMM *"necessarily* induced Elsa to breach this restrictive covenant by agreeing to become Elsa's agent." *See* Pl.'s Mem at 12–13.

■ While there is no question that inducing a party to violate a restrictive covenant gives rise to liability for tortious interference, it does not necessarily follow that because a party has entered into a new contract, the party with whom she contracted *caused* her to breach the restrictive covenant. A claim for tortious interference with an enforceable restrictive covenant must still satisfy the "but for" inducement requirement. For example, in *Innovative Networks,* 978 F.Supp. at 180, after a bench trial, the court held that plaintiff had failed to establish that the defendant induced the third party to breach his restrictive covenant because it was clear that the third party would have gone into business for himself or someone else if he had not contracted with the defendant. *See also Don King Productions v. Douglas,* 742 F.Supp. 741, 774–5 (S.D.N.Y.1990) (if third parties decided they were no longer bound by their restrictive covenant with plaintiff before they had any dealings with defendant, defendant could not have induced breach). Thus, inducement to breach a restrictive covenant requires *more* than simply entering

---

**3.** Solely for the purposes of this opinion, it is assumed that the restrictive covenant was valid

and enforceable.

into a new contract in violation of the restrictive covenant—defendant's inducement must be the "but for" cause of the breach.

As discussed above, on June 10, 1997, Elsa sought to have the Florida contract declared unenforceable. It is equally significant that the contact between Elsa and WMM occurred only because Elsa, through her attorney, sought out WMM as a prospective agent, despite the prohibitions of the restrictive covenant. Given these undisputed facts, no reasonable juror could infer that but for some action by WMM, Elsa would not have breached the restrictive covenant. Thus, WMM's motion for summary judgment on the claim of tortious interference with the Florida contract is granted.

### 2. The Pommier–Elite–Elsa New York Contract

■ Pommier alleges that WMM also tortiously interfered with the New York contract between Pommier, Elsa, and Elite. This argument fails for two reasons. First, even assuming, *arguendo*, that the oral settlement agreement is a binding contract, Pommier again fails to point to any evidence supporting its claim that WMM induced Elsa to breach that contract. Indeed, it is undisputed that on June 6, 1997, Elsa notified this Court that she would not abide by the terms of the oral agreement. Accordingly, plaintiff provides no basis from which any juror could reasonably infer that Burstyn's conversation with WMM in June or July of 1997—or any other action by WMM—was the but for cause of Elsa's breach of the New York contract. While Burstyn's conversation may have occurred prior to June 10, Pommier offers no such evidence. For the jury to reach such a conclusion would require a juror to engage in impermissible speculation.

In addition, Pommier offers no proof that WMM had any knowledge of the New York contract prior to August 11, 1997. *See* Singleton Aff. 1, Exh. 3. This was long after WMM and Elsa had reached the initial July 8 representation agreement, and after WMM arranged the Vogue photo shoot, which was performed on July 14. Thus, Pommier's tortious interference claim on the New York contract satisfies neither the inducement nor knowledge elements. As a result, WMM's motion for summary judgment is granted with respect to this claim.

### B. Unfair Competition

■ In its second claim, Pommier alleges that by representing Elsa, WMM engaged in unfair competition. Unfair competition is defined as "any form of unlawful business injury [that] is tortious in nature ... [and i]n essence, it requires business rivals to compete honestly and fairly." 104 N.Y.Jur.2d Trade Regulation § 119 at 104 (1992). A common law unfair competition claim "must be grounded in either deception or appropriation of the exclusive property of the plaintiff." *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1025 (2d Cir.1989). Such a claim "usually concerns the [defendant's] taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting Sys.,* 672 F.2d 1095, 1105 (2d Cir. 1982). Furthermore, bad faith is central to the notion of misappropriation; a claim based only on allegations that a defendant's action is "unfair" is legally insufficient without a showing of bad faith. *Saratoga Vichy Spring Co. Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980).

■ Thus, to support its claim for unfair competition, Pommier must show either that WMM engaged in deception or misappropriated Pommier's property. There is no allegation that WMM engaged in any form of deception when it agreed to represent Elsa on July 8. Pommier is therefore limited to arguing that because Elsa was contractually bound by an exclusive representation agreement, she was Pommier's exclusive property. This argument is a transparent attempt to repackage plaintiff's tortious interference claim in the guise of an unfair competition claim. By doing so, plaintiff seeks to avoid the inducement requirement of tortious interference—which it has not satisfied.

Though New York courts have broadly applied the tort of unfair competition, the Second Circuit has warned that the " 'amor-

phous cause of action is capable of mischievous application.'" *H.L. Hayden*, 879 F.2d at 1025 (quoting *Roy Export*, 672 F.2d at 1105). Pommier does not point to, nor is this Court aware of, any case applying the doctrine of unfair competition to resuscitate a failed tortious interference claim. In the absence of any supporting authority, it would be improper to supplant the doctrine of tortious interference with contract by further extension of the tort of unfair competition.

Moreover, Pommier has not satisfied the tort's bad faith requirement. Plaintiff offers no evidence from which any reasonable juror could conclude that WMM misappropriated Pommier's investment in Elsa's career in bad faith. Pommier erroneously and inexplicably argues that the mere allegations of its pleadings are sufficient to defeat WMM's motion for summary judgment. *See* Def.'s Mem. at 19–20. The Complaint avers that WMM acted in bad faith by agreeing to represent Elsa, knowing that she was under contract with Pommier. This averment is refuted by WMM's uncontested evidence that Elsa solicited WMM. The fact that Pommier invested labor and money in developing Elsa's modeling career does not support a claim for unfair competition in light of the evidence that Elsa left Pommier on her own accord. For these reasons, WMM's motion for summary judgment against Pommier's unfair competition claim is granted.

### C. *Unjust Enrichment*

Pommier's final claim is that WMM was unjustly enriched by accepting commissions on the Wesley Jessen contact lens deal, which Pommier began negotiating for Elsa. In particular, Pommier urges that WMM should be bound by industry custom, which allegedly requires that if a model changes agencies while negotiations for an advertising contract are underway, the model's new agency must compensate the old agency if it completes the contract negotiations. *See* Abrams Aff., Exh. 15 at 2; Singleton Aff. 2, Exh. H at 52–58 (Deposition of Robert Van Ryper, WMM booking agent). Pommier claims that this custom created an expectation that it would receive the commissions from the Wesley Jessen contract if WMM, or any other agency, completed the negotiations on that contract. *See* Pl.'s Mem. at 21–25. Because WMM has refused to compensate Pommier for the deal, Pommier asserts that WMM has been unjustly enriched.

 Unjust enrichment under New York law is an amorphous cause of action, but one which falls under the umbrella of quasi-contract, or contract implied-in-law. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 905 (2d Cir.1997) ("[U]nder the quasi-contractual doctrine of unjust enrichment, courts may infer the existence of an implied contract to prevent one person who has obtained a benefit from another from unjustly enriching himself at the other party's expense."); E. Allen Farnsworth, *Contracts* § 2.20 at 103–104 (2d Ed.1990). Under quasi-contract, although no express contract exists, *see Clark–Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 655, 516 N.E.2d 190 (1987), there must be some legally cognizable relationship between the parties. A defendant is not unjustly enriched by a plaintiff unless its services were performed for the defendant's benefit. As the court explained in *Kagan v. K–Tel Entertainment, Inc.*, 172 A.D.2d 375, 568 N.Y.S.2d 756, 757 (1st Dep't 1991),

> to recover under a theory of quasi-contract, a plaintiff must demonstrate that services were performed for the defendant resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.

*Id.* (citations omitted); *see also, Heller v. Kurz*, 228 A.D.2d 263, 643 N.Y.S.2d 580, 581 (1st Dep't 1996); *S. Friend, Inc. v. Pricecostco, Inc.*, 94 Civ. 8486, 1997 WL 73713, at *8 (S.D.N.Y. Feb.20, 1997). Pommier's unjust enrichment claim does not satisfy this requirement.

 Pommier's allegations appear to raise an issue of material fact with respect to the following elements of an unjust enrichment claim: (1) defendant was enriched; (2) enrichment was at plaintiff's expense; and

(3) defendant's retention of the benefit would be unjust. *See Van Brunt v. Rauschenberg,* 799 F.Supp. 1467, 1472 (S.D.N.Y.1992). But under the doctrine of quasi-contract, Pommier cannot compel WMM to compensate it for the Wesley Jessen contract unless Pommier engaged in the negotiations for the benefit of WMM. Pommier fails to adduce any evidence that it performed any services on behalf of WMM. If Pommier is entitled to be compensated for the Wesley Jessen deal, it must look to Elsa or Wesley Jessen, not to WMM. *See K–Tel,* 568 N.Y.S.2d at 757; Farnsworth, *Contracts* § 2.20 at 107.

Pommier's argument that it is entitled to recovery pursuant to industry custom is without merit, since industry custom does not create a legal obligation. Despite the existence of industry custom, without evidence that it performed the Wesley Jessen negotiations in order to benefit WMM, Pommier's unjust enrichment claim cannot succeed. Therefore, WMM's motion for summary judgment on the unjust enrichment claim is granted.

### IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment against all of plaintiff's claims is granted. Because the third party plaintiff has failed to serve either of the third party defendants within 120 days of the filing of the Third Party Complaint on December 30, 1997, as required by Fed. R.Civ.P. 4(m), the Third Party Complaint is hereby dismissed unless the third party plaintiff completes service on or before July 31, 1998.

SO ORDERED.