LINKCO, INC., Plaintiff,

v.

FUJITSU LTD., Defendant.

No. 00 Civ. 7242(SAS).

United States District Court,
S.D. New York.

Oct. 29, 2002.

Irving B. Levinson, Joseph G. Finnerty, Jr., Michael R. Hepworth, Piper Rudnick LLP, New York, NY, for Plaintiff.

Richard J. O'Brien, Paul E. Veith, Sidley Austin Brown & Wood, Chicago, IL, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Fujitsu has moved for a judgment as a matter of law ("JMOL") at the close of LinkCo's case, arguing that LinkCo failed to present sufficient evidence for a jury to find in its favor on any of the remaining three causes of action: (1) tortious interference with contract, (2) misappropriation of trade secret, and (3) unfair competition.[1] The parties have fully briefed the issue and this Court has heard oral argument.[2]

Fujitsu submits that a JMOL is required because LinkCo has failed to offer sufficient proof on at least one element of each claim. See Def. Outline at 1. Fujitsu further argues that LinkCo has presented insufficient proof of damages, which is a necessary element of each of its claims. See Id. at 2. LinkCo contends that there are numerous grounds upon which a reasonable jury could find Fujitsu liable on each of its claims. See Pl. Mem. at 1. For the reasons set forth below, the tortious interference with contract and misappropriation of trade secret claims are dismissed. The unfair competition claim, however, must be decided by the jury.

## I. STANDARD FOR JUDGMENT AS A MATTER OF LAW

After a party presents its case, judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue...." Fed. R.Civ.P. 50(a)(1). Such motions "should be granted cautiously and sparingly." *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir.2001) (citing 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2524, at 252 (2d ed.1995)). The evidence must be viewed "in the light most favorable to the opposing party" and "the court must give deference to all credibility determinations and reasonable inferences of the jury...." *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998). The court itself may not weigh the credibility of witnesses or consider the weight of the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## II. FACTUAL BACKGROUND

In 1995, LinkCo began developing an architecture for computer software to be

---

1. LinkCo withdrew its conversion claim at the start of the trial and previously withdrew its misappropriation of trade secret claim under Massachusetts law. See 9/30/02 Trial Transcript ("Tr.") at 6.

2. On October 17, 2002, Fujitsu prepared an outline setting forth the legal and factual bases for its JMOL motion. See Outline of Fujitsu's Argument Pursuant to Fed.R.Civ.P. 50(a) ("Def.Outline"). On October 18, 2002, the Court heard oral argument. See 10/18/02 Transcript of Oral Argument on Motion for Judgment as a Matter of Law ("Oral Arg. Tr."). On October 22, 2002, LinkCo filed its opposition. See Memorandum of Law in Opposition to Fujitsu's Motion for Judgment as a Matter of Law ("Pl.Mem."). On the same day, Fujitsu submitted a revised version of its October 17, 2002 outline, see Memorandum in Support of Fujitsu's Motion for Judgment as a Matter of Law Pursuant to Fed.R.Civ.P. 50(a) ("Def.Mem."), as well as a supplemental memorandum in support of its motion. See Supplemental Memorandum in Support of Fujitsu's Motion for Judgment as a Matter of Law Pursuant to Fed.R.Civ.P. 50(a) ("Def.Supp.Memo"). On the following day, Fujitsu submitted a reply to LinkCo's opposition. See Reply Memorandum in Support of Fujitsu's Motion for Judgment as a Matter of Law Pursuant to Fed.R.Civ.P. 50(a) ("Def. Reply Mem.").

used by Japanese companies for purposes of corporate financial disclosure and data management. *See Linkco, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 237838, at *1 (S.D.N.Y. Feb.19, 2002). Computer system architecture is a critical element of a software program. *See* Testimony of Bruce Webster, LinkCo's expert witness ("Webster Testimony"), Tr. at 1181. Program designers rely on system architecture to determine the objectives and purposes of the end product. *See id.* at 1180.

According to Webster, LinkCo's system architecture was comprised of 26 elements. *See id.* at 1193. The system was divided into three parts: "investor relations, corporate financial disclosure, and public relations ... within the context of database management." *Id.* at 1194. The goal of the end product was to create a database of information in the public and commercial domain and assist companies with their regulatory filings. LinkCo then intended to market this program to the business community. *See id.* Ultimately, LinkCo never commercialized any product related to its designs and the company ceased operations in December 1997. *See Linkco,* 2002 WL 237838 at *2.

LinkCo took substantial steps to keep its development efforts secret. It required all employees and consultants to sign confidentiality and nondisclosure agreements. *See* Testimony of David Israel–Rosen ("Israel–Rosen Testimony"), Tr. at 724. It also required prospective customers and corporate partners to sign confidentiality agreements before giving them access to its confidential information. *See* Testimony of Oded Maimon ("Maimon Testimony"), Tr. at 370, 492.

In May 1996, LinkCo hired Kyoto Kanda. LinkCo alleges that it entered into an Employment, Noncompetition, Nondisclosure and Nonsolicitation Agreement ("Employment Agreement") with Kanda. *See* Complaint ("Compl.") ¶ 21. Kanda was

the Chief Executive Officer of LinkCo Japan and remained with LinkCo until December 31, 1997. *See Linkco,* 2002 WL 237838, at *1.

In June 1997, Professor Ajit Kambil, a Management Information Systems expert at the Stern Business School of New York University ("NYU"), entered into a Mutual Confidential Nondisclosure Agreement ("Nondisclosure Agreement") with LinkCo, in which he agreed not to disclose "confidential information" to any third party. *See* 11/20/02 Letter from Irving B. Levinson, plaintiff's attorney, Plaintiff's Exhibit ("Pl.Ex.") 9 at L00744–45.

In September 1997, LinkCo met with Fujitsu to discuss a possible collaboration, but those negotiations were unsuccessful. *See Linkco,* 2002 WL 237838, at *1. Although LinkCo and Fujitsu met without a confidentiality agreement, LinkCo only provided Fujitsu with a general overview of its business strategy and objectives. *See* Pl. Exs. 1, 67.

Several months later, Fujitsu met secretly with Kanda and Kambil in New York. *See Linkco,* 2002 WL 237838, at *1. LinkCo alleges that Fujitsu obtained trade secrets and confidential information about LinkCo's technology, at these meetings, in violation of Kanda and Kambil's contracts. *See id.* at *2. In 1998, Fujitsu hired Kanda to conduct research and provide consulting services. *Id.* Kambil also eventually became a consultant for Fujitsu. *See* 10/1/02 Testimony of Takeshi Ito ("Ito Testimony"), Tr. at 229–31.

## III. DISCUSSION

### A. Tortious Interference with Contract Claim

Fujitsu submits that judgment as a matter of law is appropriate on LinkCo's claim of tortious interference with the following two contracts: (1) the Employment Agree-

ment between LinkCo and Kanda, and (2) the Nondisclosure Agreement between LinkCo and Kambil.

Under New York law, the elements of a tortious interference with contract claim are: "[1] that a valid contract exists, [2] that a 'third party' had knowledge of that contract, [3] that the third party intentionally and improperly procured the breach of the contract, and [4] that the breach resulted in damage to the plaintiff." *Albert v. Loksen,* 239 F.3d 256, 274 (2d Cir.2001) (citing *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996)).

"The existence of a valid contract is an essential element of the cause of action, and the courts have consistently rejected claims of tortious interferences in its absence." *Mobile Data Shred, Inc. v. United Bank of Switzerland,* No. 99 Civ 10315, 2000 WL 351516, at *7 (S.D.N.Y. Apr.5, 2000). " 'Although a defendant need not be aware of all the details of a contract, it must have actual knowledge of the specific contract.' " *Sovereign Bus. Forms v. Stenrite Indus., Inc.,* No. 00 Civ. 3867, 2000 WL 1772599, at *9 (S.D.N.Y. Nov.28, 2000) (quoting *International Minerals & Res., Inc. v. Pappas,* No. 87 Civ. 3988, 1992 WL 354504, at *3 (S.D.N.Y. Nov.17, 1992)). Defendant's actions must also be the "but for" cause of the alleged breach of contract. *See Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 828 (2d Cir. 1990) ("A plaintiff must allege that 'there would not have been a breach but for the activities of the defendants.' ") (quoting *Special Event Entm't v. Rockefeller Center, Inc.,* 458 F.Supp. 72, 78 (S.D.N.Y. 1978)). *See also Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt.,* 14 F.Supp.2d 331, 335–36 (S.D.N.Y.1998) (finding that the element of inducement "requires the plaintiff to establish that but for the allegedly tortious conduct of the defendant, the third party

would not have breached her contract"), *aff'd,* 173 F.3d 845 (2d Cir.1999).

### 1. Kanda Contract

#### a. Is There a Valid Contract?

■ Fujitsu argues that LinkCo has failed to provide a sufficient evidentiary basis upon which a reasonable jury could: (1) conclude that Kanda was a party to a "valid" contract with LinkCo, and (2) determine the nature of any such contractual obligations. *See* Def. Outline at 4.

When a party alleges that a written agreement exists and was breached, it is incumbent upon that party to provide the contract or sufficient evidence from which the essential terms of that written agreement can be ascertained. *See Sims v. Blanchris,* 648 F.Supp. 480, 484–85 (S.D.N.Y.1986) (holding that plaintiff did not meet the burden of proof on breach of contract claim when contract was not produced, testimony regarding it was inconclusive, essential terms were in doubt, and no satisfactory evidence of an alleged breach had been adduced).

Although the Complaint alleges that Kanda entered into an Employment Agreement with LinkCo, in which he agreed not to disclose any of LinkCo's intellectual property to a third party, Link-Co produced no such written contract at trial. *See* Compl. ¶¶ 21–22; 10/9/02 Israel–Rosen Testimony, Tr. at 730–31 (acknowledging LinkCo's inability to locate Kanda's Employment Agreement). Link-Co did, however, offer into evidence: (1) testimony to the effect that Kanda signed one or more written contracts at a meeting that took place in 1996, *see* Maimon Testimony, Tr. at 339; Israel–Rosen Testimony, Tr. at 725–26; and (2) a written contract between LinkCo and Oded Maimon, which LinkCo asserts to be the same form of contract as the one signed by Kanda, *see* Pl.Ex. 10 at L09696–700.

The testimony at trial could not support a finding by a reasonable jury that Kanda signed a contract *identical* to the one signed by Maimon. *See* Israel–Rosen Testimony, Tr. at 724–26 (expressing confusion as to whether Kanda signed an employment agreement with a nondisclosure provision or three separate documents, the second of which was a nondisclosure agreement); Maimon Testimony, Tr. at 342 (discussing individualized provision in Maimon's contract regarding the purchase of a motorcycle). *But see* Maimon Testimony, Tr. at 341 (stating belief that language regarding obligation to protect confidential information was identical in all employment agreements).

The fact that employment contracts typically contain nondisclosure and noncompete provisions, as noted by LinkCo, *see* Pl. Mem. at 1–2, is insufficient to prove that a party is bound by such provisions. *See McKay v. Communispond, Inc.*, 581 F.Supp. 801, 806 (S.D.N.Y.1983) (finding form employment contract containing anticompetitive clause insufficient to establish that plaintiff was bound by the contract and its covenant not to compete where defendant did not produce a signed contract).

Without proof of the written contract, or the terms contained therein, there is minimal evidence from which a jury could conclude that Kanda was party to a valid contract. Nevertheless, because a reasonable jury could infer from Maimon's testimony that Kanda signed a nondisclosure agreement, although the form of the contract containing such provision is unknown, the jury should be permitted to assess the credibility of the witnesses and weigh the evidence on this element. However, because LinkCo has failed to offer sufficient evidence on two of the remaining elements

of tortious interference with contract, the claim must nonetheless be dismissed.

### b. Knowledge and Inducement

*First*, the trial record is devoid of any evidence of Fujitsu's direct knowledge of the employment contract between LinkCo and Kanda with which it is alleged to have interfered. *See* Ito Testimony, Tr. at 188–89 (acknowledging that Fujitsu did not ask, prior to hiring Kanda, whether Kanda had an employment agreement with LinkCo).[3] LinkCo relies on testimony that Takeshi Ito, a Fujitsu executive, thought nondisclosure agreements were "a matter of course" and "common practice" in employment. *See* Pl. Mem. at 4–5 (citing Ito Testimony, Tr. at 681–82). LinkCo argues that there is an implied contractual obligation in all employment contracts not to disclose trade secrets, and that Fujitsu is therefore presumed to have knowledge of the two contracts. *See* Pl. Mem. at 4. Assuming, *arguendo*, that Fujitsu had knowledge of this implicit obligation, which is highly unlikely, it did not have actual knowledge of the contracts at issue, as required by law. *See Sovereign Bus. Forms*, 2000 WL 1772599, at *9 (rejecting plaintiff's argument that defendant should have known of existence of non-competition agreement as tenuous and speculative); *AA Tube Testing Co. v. Sohne*, 20 A.D.2d 639, 246 N.Y.S.2d 247, 248 (2d Dep't 1964) (finding allegation that defendants "should have known" of existence of contract insufficient allegation of "actual" knowledge).

In support of the proposition that Fujitsu had implied knowledge of Kanda's contract, LinkCo relies on *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir.1999). *See* Pl. Mem. at 2. Such reli-

---

3. The absence of proof is so evident that LinkCo has not even attempted to identify trial testimony to illustrate Fujitsu's direct knowledge of Kanda's contract. *See* Pl. Mem. at 2–4 (citing testimony that Fujitsu only knew Kanda was employed by LinkCo).

ance is misplaced. In *North Atlantic*, the question was whether an employee's use of a trade secret breached an implied duty in his employment contract not to reveal confidential information acquired in the course of employment. 188 F.3d at 47. The court did not address whether a third party is presumed to have knowledge of that employee's implied obligation. Moreover, the court recognized that an employer and employee may contractually limit this implied duty. *Id.* at 47–48. However, there is no proof that any Fujitsu employee reviewed the terms of Kanda's alleged contract to determine whether it limited the nondisclosure obligation.

*Second,* there is no evidence in the record from which a reasonable jury could conclude that Fujitsu induced Kanda to breach his contract with LinkCo. LinkCo points to two pieces of evidence in the record as proof of inducement: (1) the transmission of documents by Kanda to Fujitsu in the Fall of 1997, and (2) the payments Kanda received from Fujitsu in 1998. *See* Pl. Mem. at 5–6. The fact that Kanda transmitted one or more documents to Fujitsu is irrelevant, unless LinkCo can show that Fujitsu caused the transmission to happen, which it has not done. Likewise, the fact that Fujitsu made payments to Kanda on consulting agreements in June 1998, many months after the transmission of the November 20, 1997 memorandum, *see* Pl.Ex. 2, the alleged breaching act, is meaningless in the absence of evidence that the payments were in exchange for the information contained in that document. *See* Pl. Mem. at 6 (citing Maimon Testimony, Tr. at 399–403, 463). If the jury were to conclude from either of these two pieces of evidence, without fur-

ther proof, that Fujitsu induced Kanda to breach his contract, such a conclusion would be mere speculation, which is impermissible. *See D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998) (citations omitted) ("The non-moving party [to a JMOL motion] may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

Without evidence of Fujitsu's actual knowledge of Kanda's employment agreement or proof of inducement, this Court is compelled to grant judgment as a matter of law on LinkCo's tortious interference with contract claim.[4]

### 2. Kambil Contract

LinkCo has produced the Nondisclosure Agreement it had with Kambil. *See* Pl.Ex. 9 at L00744–45. However, there is no evidence of Fujitsu's direct knowledge of Kambil's contract or of Fujitsu's inducement of Kambil to breach that contract. In addition, there is no evidence as to what "confidential" information Kambil allegedly disclosed to Fujitsu, without which a breach cannot be established. *See* Def. Outline at 5. Fujitsu's motion for a JMOL with respect to tortious interference with Kambil's contract is also granted.

### B. Misappropriation of Trade Secret Claim

To succeed on a claim for trade secret misappropriation under New York law, a plaintiff must establish "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in

---

**4.** In a pretrial telephone conference, this Court ruled that the only way LinkCo could recover damages for its claim regarding Fujitsu's use of the TanshinStation name is if the elements of the tortious interference claim were established, and the use of "TanshinSta-

tion" by Fujitsu were found to be a consequence of that interference. Because I am dismissing the tortious interference claim, there is no basis for an award of damages for the use of the TanshinStation name.

breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North Atlantic*, 188 F.3d at 43–44.

### 1. What Is a Trade Secret?

New York courts have adopted the general definition of a trade secret set forth in the Restatement of Torts § 757, comment b (1939), which states as follows: "A trade secret may consist of any formula, pattern, device or compilation of information which is *used in one's business*, and which gives [the owner] the opportunity to obtain an advantage over competitors who do not know or use it." *See Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 955, 968 (2d Cir.1997) (quoting Restatement of Torts § 757 cmt. b (1939) (emphasis added)).

There are two types of trade secrets: customer lists and special knowledge or information that relates to manufacturing or business operations. *See* 2 N.Y. PJI3d 407 (2001). New York courts have recognized that computer software, or programs, can be a trade secret. *See Business Intelligence Servs., Inc. v. Hudson*, 580 F.Supp. 1068, 1072 (S.D.N.Y.1984) (citing *Matter of Belth v. Insurance Dep't of New York*, 95 Misc.2d 18, 406 N.Y.S.2d 649 (1977) (finding description of computer program and details of mathematical models, procedures, and statistical assumptions developed by an insurance company constitute trade secrets)). LinkCo's claim does not concern customer lists, a manufacturing process or formula, or a software program. Rather, the alleged trade secret is the architecture or design of a business system for managing the disclosure of the financial information of Japanese compa-

nies for the benefit of both the companies and their investors. Thus, the first question is whether this information constitutes a trade secret under New York law.[5]

### 2. Is "Software Architecture" a Trade Secret?

■ "In determining whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *North Atlantic*, 188 F.3d at 44 (internal quotation marks and citations omitted).

#### a. Secrecy

"[T]he most important consideration [is] whether the information was secret."[6] *See Lehman v. Dow Jones, & Co., Inc.*, 783 F.2d 285, 298 (2d Cir.1986). Although "secrecy is a question of fact," *see id.*, courts have held that there can be no trade secret protection, as a matter of law, if the secrecy is necessarily lost when the design or product is placed on the market. *See Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1177 (2d Cir.1993) (finding that hotel room design concept was not a trade secret because it would be publicly disclosed once the hotel room was built, marketed and occupied), *abrogated*

---

5. The parties agree that a trade secret can consist of separate elements, each of which is in the public domain, when there is something novel and unique about the combination of the elements creating a unified process,

design or operation. *See* Pl. Mem. at 9; Def. Reply Mem. at 3.

6. Four of these six factors concern secrecy: factors 1, 2 3, and 6.

*on other grounds by Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368 (2d Cir.2000); *Speciner v. Reynolds Metals Co.,* 279 F.2d 337, 337–38 (2d Cir.1960) (finding that a window design was not a trade secret where the features "were readily apparent from a casual inspection of the plaintiff's window which was available on the open market"); *Blank v. Pollack,* 916 F.Supp. 165, 175 (N.D.N.Y.1996) (finding a window crank not to be a trade secret because it is "a device, that upon marketing and sale is open to public inspection of all of its features"); *Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (4th Dep't 1982) (finding no trade secret when "any secrecy in the design of the trap was lost when it was placed upon the market"). Thus, the primary consideration in determining secrecy is whether the information is easily ascertainable by the public.

Computer programs have been found to constitute a trade secret where the source code is not easily copied or ascertainable by inspection of the program. *See, e.g., Q-Co Indus., Inc. v. Hoffman,* 625 F.Supp. 608, 617 (S.D.N.Y.1984) (finding source code of plaintiff's computer program was not accessible to the public and therefore the program was likely to be a trade secret); *Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 664 (4th Cir.1993) ("The source code can and does qualify as a trade secret ... [because it] is not readily ascertainable by proper means ..."). The architecture of a software program may also be a trade secret where only a limited amount of technical detail about the program is disclosed to the public. *See Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 174 (2d Cir.1990) (finding that plaintiff's unique

combination of computer programs was a protectable trade secret because "[t]he architecture of the ICM system was not 'readily ascertainable'") (citation omitted).

In this case, however, the alleged trade secret is not a computer program or combination of programs with one or more source codes. It is merely a system architecture. *See* Webster Testimony, Tr. at 1181 (distinguishing between the design and architecture of a software system and the ultimate product that gets derived from that design). In fact, plaintiff's counsel and witnesses have compared LinkCo's system to the architecture of a building. *See* Tr. at 48; Webster Testimony, Tr. at 1180. While this analogy helps to explain how LinkCo's combination of elements may be novel, it also demonstrates how the architecture will be easily ascertainable by the public once the product is marketed. Similar to the architecture of a building, once the combination of LinkCo's elements is seen by the public, the system's architecture will become obvious and easily duplicated. In *Hudson Hotels,* the court found that once the hotel room is "built, marketed, and occupied, the features of the room would necessarily be disclosed publicly." *Hudson Hotels,* 995 F.2d at 1177. The same is true with LinkCo's software architecture. Once the 26–element software architecture system is reduced to a product, its architecture can never remain secret. Because the software architecture cannot remain secret once it is marketed, it cannot rise to the level of a trade secret, as a matter of law.[7]

**b. Alternative Ground for Rejecting Trade Secret**

It is well-established that marketing concepts and new product ideas are not

---

7. Because the system architecture cannot be a trade secret, there is no need to discuss the proof as to whether defendant used the alleged trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *See supra* Part III.B.

considered trade secrets. *See Hudson Hotels,* 995 F.2d at 1177 (addressing, in *dicta,* the notion that a new product idea cannot, as a matter of law, constitute a trade secret); *Boyle v. Stephens, Inc.,* No. 97 Civ. 1351, 1997 WL 529006, at *4–5 (Aug. 26, 1997) (holding that plaintiff's concept of structuring a mutual fund according to different risk allocations was either a new marketing concept or a new product and, as such, could not be considered a trade secret), *aff'd,* No. 98–9444, 2001 WL 1313784 (2d Cir. Oct.24, 2001). Webster's description of LinkCo's 26 "corporate disclosure elements," suggests that these elements may be nothing more than an amalgamation of business concepts, strategies, and ideas to be used in the eventual construction of a marketable computer software program. *See* Pl.Ex. 360.

Similarly, information consisting simply of business possibilities or goals is not a trade secret. *See PSC Inc. v. Reiss,* 111 F.Supp.2d 252, 258 (W.D.N.Y.2000) ("It is also difficult to see how the meager information that [defendant] had obtained constituted trade secrets. Some of the items that [plaintiff] stated were confidential were merely goals that [plaintiff] hoped to achieve over time in developing its new product."); *Forest Labs., Inc. v. Lowey,* 218 U.S.P.Q. 646, 657 (Sup.Ct. Westchester Co.1982) ("[U]ndeveloped ideas and plans concerning future improvements in the [plaintiff's] process are not protectible as trade secrets."), *aff'd,* 106 A.D.2d 368, 482 N.Y.S.2d 500 (2d Dep't 1984). Many of LinkCo's 26 elements are merely possibilities and goals (*e.g.,* security, version control, database management and multiple formats for reports).

While I find it highly unlikely, it is possible that a reasonable jury could find that LinkCo's software architecture system is something more than a marketing concept, new product idea, possibility, goal or some combination thereof. Because I conclude that LinkCo's 26–element corporate disclosure system cannot be a trade secret as it is does not satisfy the element of being "used secretly and continuously in commerce", *Hudson Hotels,* 995 F.2d at 1177, I need not decide whether it also fails as a trade secret for these alternative reasons.

## C. Unfair Competition Claim

The central principle underlying a claim for unfair competition under New York law is that one may not misappropriate the results of the labor, skill, and expenditures of another. *See Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). An unfair competition claim must also involve some degree of bad faith. *Id.*

The New York pattern jury instructions identify several types of unfair competition: trade secrets, trademark, trade name infringement, palming off, misappropriation, and false labeling or advertising. *See* 2 N.Y. PJI3d 405 (2001). However, the Second Circuit has made clear that unfair competition is not limited to the categories of infringement that have been described in New York's pattern jury instructions or recognized by courts, but instead encompasses a broad range of conduct. *See National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 851 (2d Cir.1997) (describing New York unfair competition law as standing for the "broader principle that property rights of commercial value are to be and will be protected from any form of commercial immorality") (internal quotation marks and citation omitted); *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir.1982) ("New York courts have noted the 'incalculable variety' of illegal practices falling within the unfair competition rubric ... calling it a 'broad and flexible' doctrine...."); *Electrolux Corp. v. Val–Worth, Inc.,* 6 N.Y.2d 556,

568, 190 N.Y.S.2d 977, 161 N.E.2d 197 (1959) ("Unfair competition is a form of unlawful business injury ... The incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use.") (internal quotation marks and citation omitted). This "adaptable and capacious tort" proscribes all forms of commercial immorality, the confines of which are marked only by the "conscience, justice and equity of common-law judges." *Demetriades v. Kaufmann,* 698 F.Supp. 521, 525 (S.D.N.Y.1988) (internal quotation marks and citations omitted).

### 1. Misappropriation of Trade Secrets and Ideas

■ Fujitsu argues that there are only two possible predicates to LinkCo's unfair competition claim: trade secret misappropriation and idea misappropriation. *See* Def. Outline at 7–8. The parties agree that if the predicate is trade secret misappropriation, then LinkCo's unfair competition claim is duplicative of its trade secret claim. *See* Def. Outline at 7; Oral Arg. Tr. at 1961; *see also Abernathy–Thomas Eng'g Co. v. Pall Corp.,* 103 F.Supp.2d 582, 599–600 (E.D.N.Y.2000) (treating misappropriation of trade secrets and unfair competition as stating a single cause of action when an unfair competition claim is based on wrongful disclosure of proprietary information); *Atmospherics, Ltd. v. Hansen,* 269 A.D.2d 343, 702 N.Y.S.2d 385, 386 (2d Dep't 2000) (affirming judgment as a matter of law at close of plaintiff's case for misappropriation of trade secrets and unfair competition when no rational jury could conclude that plaintiff's information constituted trade secrets). Because I am granting judgment as a matter of law on LinkCo's trade secret claim, no further discussion of this predicate is required.

Under New York law, a claim for idea misappropriation requires: (1) a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in-fact-contract, or quasi-contract, and (2) a novel and concrete idea. *See Adsani v. Miller, PMA,* No. 94 Civ. 9131, 1996 WL 194326, at *16 (S.D.N.Y. Apr.22, 1996). Fujitsu submits that there is no sufficient evidentiary basis that would permit a reasonable jury to find that a legal relationship exists between the parties. *See* Def. Outline at 8. LinkCo concedes that there is no such relationship. *See* Oral Arg. Tr. at 1962. Accordingly, Link-Co has no idea misappropriation claim.

### 2. Misappropriation of Information

■ Instead, LinkCo argues that there can be a misappropriation of labor, skill, and expenditures that does not fall within either trade secret or idea misappropriation. *See* Pl. Mem. at 23. In support of this claim, LinkCo points to the fact that New York courts have recognized an additional tort—unfair competition based on "investment" misappropriation—despite the fact that there are separate torts for trade secret misappropriation and idea misappropriation, which suggests that unfair competition is a broader cause of action. *See id.* at 22.

Indeed, the doctrine of unfair competition has been applied in various situations, like this, where a plaintiff alleges misappropriation of information that does not rise to the level of misappropriation of trade secrets or ideas. *See, e.g., Robotic Vision Sys., Inc. v. General Scanning, Inc.,* No. 96–CV–3884, 1997 WL 1068696, at *6 (E.D.N.Y.1997) (finding that allegations of misappropriation of information regarding a bidding strategy used to acquire a company support a claim for unfair competition under New York law); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs.,* 871 F.Supp. 709, 729–30 (S.D.N.Y.1995) (holding that unauthorized

physical taking and exploitation of internal company documents for use in competitor's business constitutes unfair competition, although information taken would not qualify as a trade secret); *Demetriades,* 698 F.Supp. at 526 (applying law of unfair competition where interior features of an unsold residence were found not to be trade secrets); *Continental Dynamics Corp. v. Kanter,* 64 A.D.2d 975, 408 N.Y.S.2d 801, 802 (2d Dep't 1978) (holding that misappropriation of customer lists, although not considered trade secrets, nevertheless states cause of action under unfair competition).

A claim for unfair competition based on misappropriation generally involves the taking of a property right. *Roy Export,* 672 F.2d at 1105. New York courts have found that persons have a protectable property interest in their "labor, skill, expenditure, name and reputation...." *See Metropolitan Opera Ass'n. v. Wagner–Nichols Recorder Corp.,* 199 Misc. 786, 101 N.Y.S.2d 483, 492 (Sup.Ct.N.Y.Co.1950). Undoubtedly, there is substantial evidence in the record for a jury to find that LinkCo invested labor, skill, and expenditures in the development of its system. *See Linkco,* 2002 WL 237838, at *3 (finding LinkCo had more than twenty professionals working for over two years on its system, at a cost of over two million dollars); 10/14/02 Testimony of Bruce Webster ("Webster Testimony"), Tr. at 1191–92, 1418 (acknowledging the magnitude of documents produced by LinkCo in conjunction with the development of its system as compared to the lack of any Fujitsu architecture development documents prior to September 1997). In addition, there is sufficient proof for a reasonable jury to find that Fujitsu misappropriated the information in bad faith and used it for its own benefit. *See* Ito Testimony, Tr. at 160, 183–84, 229–30 (acknowledging Kanda had information regarding Japan's disclosure system that Fujitsu could use); Maimon Testimony,

Tr. at 399–403, 463 (testifying that documents Fujitsu received from Kanda contained information on LinkCo's business ideas that should not have been disclosed); Ito Testimony, Tr. at 155, 171, 212, 222–23 (describing Fujitsu's secret meetings with Kanda and Kambil in New York). Because the weight of such evidence may only be decided by a jury, judgment as a matter of law on LinkCo's unfair competition claim is inappropriate, provided LinkCo has proffered sufficient evidence of damages as a result of Fujitsu's misappropriation of information. *Cf. Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 612 (2d Cir.1994) (affirming summary judgment dismissal of RICO claim where plaintiff failed to present any demonstrable damages).

### D. Damages

Because the claims for tortious interference with contract and misappropriation of trade secret are dismissed, the sole remaining question is whether there is a legally sufficient evidentiary basis for a jury to calculate an award of damages on LinkCo's unfair competition claim. *See* Def. Outline at 2. Fujitsu argues that there is insufficient proof in the record from which a jury can "fill in the blanks" in the methodology for calculating damages offered by LinkCo's expert, Aron Levko. *Id.* LinkCo contends that the evidence is not only greater than Fujitsu suggests, but also sufficient for a jury to either "fill[ ] in Levko's blanks" or use alternate methods to determine damages. Pl. Mem. at 19.

The assumption underlying the parties' damages arguments is that this is a trade secret misappropriation case, for which this Court has ruled that the most appropriate measure of damages is a reasonable royalty. *See* 9/4/02 Tr. at 3–4. However, it is now necessary to determine the appropriate measure of damages on an unfair

competition claim, an issue upon which this Court has not yet ruled. Once a method for calculating damages has been established, the final question is whether Link-Co has offered sufficient proof from which a reasonable jury can determine the amount of damages.

Damages in unfair competition cases are typically determined by plaintiff's lost profits resulting from defendant's improper conduct. *See American Safety Table Co. v. Schreiber*, 415 F.2d 373, 380 (2d Cir. 1969). The losses must be directly attributable to the unfair acts of defendant. *See American Electronics, Inc. v. Neptune Meter Co.*, 30 A.D.2d 117, 290 N.Y.S.2d 333, 335 (1st Dep't 1968) ("The basic rule of damage in a case of unfair competition is the amount plaintiff would have made except for defendant's wrong."). In addition, the evidence of such losses must not be speculative. *See American Safety*, 415 F.2d at 381 (finding recovery for lost profits not justified where proof of profits would be speculative).

In trade secret misappropriation cases, however, the courts have diverged from a straight lost profits analysis in cases where plaintiff's losses and defendant's actual gain cannot be easily computed. *See Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir.1996) (finding "reasonable royalty" method appropriate where there is insufficient evidence of lost profits or unjust enrichment). A reasonable royalty award attempts to measure, as of the time of the misappropriation, a hypothetically agreed value of the property defendant wrongfully obtained. *Id.* (citing *Georgia–Pacific Corp. v. United States Plywood–Champion Papers, Inc.*, 446 F.2d 295, 296–97 (2d Cir.1971)).

██ I have already held that a reasonable royalty would have been the best method for calculating damages for Fujitsu's alleged misappropriation of a trade secret because lost profits would be difficult to establish given that: (1) LinkCo ceased operations not long after the alleged misappropriation, and (2) Fujitsu made no significant profits from such misappropriation. *See* 9/4/02 Tr. at 4. A similar method should be used with respect to the lost profits element of damages in an unfair competition claim because the same difficulties exist with respect to calculating potential profits.

Moreover, it is well established that if there is a claim, there must be a remedy. *Cf. Commercial Union Assurance*, 17 F.3d at 612 (affirming dismissal of action because plaintiffs could not prove the "most fundamental of legal elements necessary to support a viable cause of action—any demonstrable damages"). As noted earlier, New York courts have recognized that unfair competition is broadly construed to include misappropriation of a competitor's property, even if such property does not qualify as a trade secret. While none of the cases cited in Part III.C.2, *supra*, discussed damages, the absence of profits cannot nullify the claim any more than it would in the context of misappropriation of a trade secret. As discussed, the courts have fashioned a method for calculating damages for misappropriation of trade secrets in the absence of profits. The same method can be applied in the context of misappropriation of information. *See Flexitized, Inc. v. National Flexitized Corp.*, 214 F.Supp. 664, 675 (S.D.N.Y.1963) ("The law of unfair competition, however, must be applied flexibly, and whether relief should be granted in a given instance must be determined by an appraisal of the particular circumstances of the case."), *rev'd on other grounds*, 335 F.2d 774 (2d Cir.1964).

The following factors should be considered when assessing damages on an unfair competition claim based on the misappropriation of information: (1) the time spent

developing the information, (2) the money invested, (3) the labor invested, and (4) a reasonable portion of the expected profitability of the final product that incorporates the misappropriated information, measured at the time of a hypothetical negotiation for the sale or licensing of the property created by plaintiff's labor, skill and expenditures. In determining the "reasonable portion of the expected profitability," the jury must evaluate how much of the final product was based on plaintiff's information. Because plaintiff's work does not rise to the level of a trade secret, plaintiff is not entitled to the full reasonable royalty that would be paid for the use of a trade secret. Trade secret law places a premium on the value of secrecy, and creates exclusive rights in the holder of the secret. Misappropriation of information cannot be used as an end-run around the secrecy requirement.

The absence of evidence of any of these factors is not dispositive. For example, the inability to find profits does not preclude a damage award. A jury may choose to award damages solely for the amount of money or time plaintiff invested in developing the information.

LinkCo has presented many documents and hours of testimony concerning its damages. Although much of the evidence is circumstantial, the Court may not weigh the credibility of witnesses or consider the weight of the evidence. *See Reeves*, 530 U.S. at 150, 120 S.Ct. 2097. Instead, the Court must review all of the evidence in the light most favorable to plaintiff. *See Galdieri–Ambrosini*, 136 F.3d at 289. Based on a careful and extensive review of the evidence, and the measure of damages articulated above, I conclude that LinkCo has produced sufficient evidence for a rational jury to compute damages, if Fujitsu is found liable. Should the jury award damages to LinkCo, Fujitsu will have an opportunity to challenge that award if it

believes that any portion of it is speculative or against the weight of the credible evidence.

## IV. CONCLUSION

For the reasons set forth above, LinkCo's claims for tortious interference with contract and misappropriation of trade secret are dismissed. Fujitsu's motion to dismiss LinkCo's claim of unfair competition is denied.